HOH INDIAN TRIBE, et al., Plaintiffs,

v.

Malcolm BALDRIGE, Secretary of Commerce, Defendant,

v.

STATE of Washington, Intervenor-Defendant.

No. C 81–742R(C).

United States District Court, W. D. Washington.

Sept. 22, 1981.

684

Susan K. Hvalsoe of Cullen, Holm, Hoglund & Foster, Olympia, Wash., for plaintiffs.

Carl V. Ullman, Taholah, Wash., for Quinalt Indian Nation.

Donald A. Carr, Dept. of Justice, Washington D. C., for defendant.

James M. Johnson, Asst. Atty. Gen., State of Wash., Olympia, Wash., for State of Wash., an intervenor-defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CRAIG, Senior District Judge.

### STATEMENT OF THE CASE

This case involves the treaty fishing rights of three separate Washington coastal Indian tribes as they are affected by the regulations of the defendant Secretary of Commerce governing fishing for salmon in the waters of the Fishery Conservation Zone off California, Oregon, Washington, and Alaska and regulations of the intervenor-defendant State of Washington in state waters of northwestern Washington.

The action was commenced on June 22, 1981, and the matter came on for hearing August 3, 1981, on plaintiffs' and defendant's cross-motions for summary judgment.

This Court has jurisdiction under 28 U.S.C. § 1362 and 16 U.S.C. §§ 1855(d) and 1861(d). Venue exists under 28 U.S.C. § 1391(b) and (e).

The Court having considered the Pleadings, the Administrative Record before the Secretary of Commerce, testimony given before the Court, and the written and oral submissions of the parties, now hereby makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The Hoh Indian Tribe, the Quileute Tribe of the Quileute Reservation, and the Quinault Indian Nation are separate and distinct federally recognized Indian tribes each of which separately holds fishing rights secured by the Treaty of Olympia, 12 Stat. 971, to take salmon and other fish at their respective usual and accustomed fishing places located on and off of their respective reservations. These rights have been authoritatively construed and defined in the ongoing case of *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash. 1974), 520 F.2d 676 (9th Cir. 1975), 459 F.Supp. 1020, 573 F.2d 1123 (9th Cir. 1978), *substantially affirmed sub nom. Washington v. Washington Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). This Court has retained continuing jurisdiction in that case. The Quileute Reservation is located at the mouth of the Quillayute River, the Hoh Reservation is at the mouth of the Hoh River, and the Quinault Reservation is further south on the Washington coast and includes the mouth and major portions of the Queets River and substantially all of the Quinault River and its tributaries. The Quinault Nation also has off-reservation usual and accustomed fishing grounds in Grays Harbor and portions of its watershed. The location of each reservation was selected primarily to provide the respective tribes and bands a home near, and direct access to and exclusive use of, some of their principal salmon and steelhead fishing grounds.

2. The Secretary of Commerce (hereinafter "Secretary") is responsible for approving or preparing, implementing, and (together with the Secretary of Transportation) enforcing fishery management plans or amendments to such plans (hereinafter collectively "FMP") under the Magnuson Fishery Conservation and Management Act (90 Stat. 331, 16 U.S.C. §§ 1801–1882) (hereinafter "FCMA") in the Fishery Conservation Zone from 3 to 200 miles off the coast of the United States (16 U.S.C. § 1811) and for promulgating regulations governing such fisheries. The Secretary relies heavily on the statutorily-created (16 U.S.C. § 1852) Pacific Fishery Management Council (PFMC) and North Pacific Fishery Management Council (NPFMC) for development of, and for advice on, plans, and the preparation of proposed regulations, for the fisheries off California, Oregon, and Washington, and off Alaska, respectively. The FCMA requires that any fishery management plan must contain the conservation and management measures which are consistent with the national standards set forth in 16 U.S.C. § 1851, the provisions of the FCMA, and any other applicable law including applicable treaties with Indian tribes.

3. Salmon and steelhead are anadromous fish which, in the case of the runs primarily involved here, are hatched in the

waters of the north coastal rivers of Washington, migrate to the Pacific Ocean at varying stages of their juvenile development—depending upon the species—where they pasture and mature over a wide migratory range extending through waters off Alaska, British Columbia, Washington, and Oregon, and to a lesser extent California—before returning to their native stream to spawn. In the course of their migration they are subject to fisheries in the ocean waters and, upon their return to their respective rivers of origin, to fisheries in those rivers and interconnected lakes. The regulatory jurisdiction over these fisheries is extremely complex, and is fragmented among the Secretary, Canada, four coastal states, an international commission, the Secretary of the Interior and the individual treaty tribes depending upon the area or fishermen involved.

4. The coho salmon is perpetuated primarily on a three-year cycle. The typical life history pattern consists of one year of juvenile residence in fresh-water and two summers in the marine environment, with maturing adults returning to spawn in their third year of life during the months from August through December. *United States v. Washington*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, Ex. JX 2A, p. 4 and Tables 1, 38–41. Coho salmon originating in the Washington coastal rivers contribute to ocean fisheries from Southeast Alaska to California (*id.*, p. 32).

5. The FMP for Managing the 1981 Salmon Fisheries off the coast of California, Oregon and Washington, prepared by the PFMC (hereinafter "1981 FMP"), which is in the form of an amendment to the 1978 FMP for those fisheries, was approved by the Secretary's designee on May 18, 1981, and the 1981 Regulations were issued as Emergency Interim rules, effective June 5, 1981. 46 F.R. 30633. They were extended for an additional 45 days on July 22, 1981. 46 F.R. 37703.

6. For management sub-area A, the area between the Canadian boundary and Cape Falcon, Oregon (also referred to as the WPP area), the Secretary's 1981 regulations provide for a commercial troll season from May 1 to May 31 for all salmon species except coho and an all salmon species commercial season from July 15 to September 1, the latter being subject to closure when the commercial coho harvest in the area reaches 372,000 fish. For the same area the regulations provide for a recreational fishery from May 23 to September 7 with a daily bag limit of two salmon (three north of the Queets River, only two of which may be chinook or coho) subject to closure when the recreational coho harvest in the area reaches 248,000 fish. 1981 FMP, pp. 1–3.

7. In *United States v. Washington (supra)*, this Court held that the rights secured by the treaties to the plaintiff tribes is a reserved right which is linked to the areas where the Indians fished during treaty times and which exists in part to provide a volume of fish which is sufficient for the fair needs of the tribes. Neither the Indians nor the non-Indians may fish in a manner so as to destroy the resource or to preempt it totally. The State's police power to regulate the exercise of the treaty right "exists only to the extent necessary to protect the fishery resource." It is limited to those measures which "are reasonable and necessary to the perpetuation of a particular run or species of fish." 384 F.Supp. 312, 342 and Conclusions of Law Nos. 20, 23 and 28, at pp. 401–402. A run is defined as "a group of anadromous fish on its return migration, identified by species, race and water of origin." Id. at 405. This Court also held in that case that:

"The shares which treaty and nontreaty fishermen are to be accorded the opportunity to harvest shall be calculated on a river-system by river-system basis wherever practical. This shall be based upon the system of origin and shall apply regardless of where the fishery occurs. * * In some cases, for more effective management or because data for stock separation do not exist, the sharing must be on a regional basis.

"Shares will be calculated * * * on a river-system by river-system basis for * * the Washington coast * * *.

*       *       *       *       *       *

"All parties shall manage the salmon runs so as to insure that salmon in sufficient numbers return to each region or each river system or each combination as described above to allow treaty fishermen a fair opportunity to harvest their shares."

*Id.*, 459 F.Supp. 1020, 1070. These holdings were affirmed by the United States Supreme Court in *Washington v. Fishing Vessel Assoc. (supra)* which held:

"In our view * * * the treaties secure the Indians' right to take a share of each run of fish that passes through tribal fishing areas."

443 U.S. at 679, 99 S.Ct. at 3071.

"We also agree with the Government that an equitable measure of the common right should initially divide the harvestable portion of each run that passes through a 'usual and accustomed' place into approximately equal treaty and nontreaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount."

*Id.*, at 685, 99 S.Ct. at 3074. The Supreme Court further held that the FCMA:

"clearly place[s] a responsibility on the United States, rather than the State, to police the take of fish in the relevant waters by Washington citizens insofar as is necessary to assure compliance with the treaties."

*Id.*, at 688, 99 S.Ct. at 3076.

8. The principal Washington north coastal river systems or watersheds on which the major treaty fisheries of the plaintiff tribes are presently located and which are appropriate to be treated as having separate runs of salmon for purposes of allocating fish between treaty and nontreaty fisheries are:

a) Quillayute River System;

b) Hoh River System;

c) Queets River System;

d) Quinault River System; and

e) Grays Harbor and its watershed.

9. The ocean management plans implemented by the Secretary since 1977 have resulted in substantial reductions in offshore catches of both chinook and coho salmon. In 1977 some 443,000 chinook and 1,206,000 coho salmon were harvested off the coast of Washington. In 1979 the comparable figures were 224,000 and 956,000, respectively. In 1980 the chinook harvest was further curtailed to 187,000 and the coho harvest to 748,000. Ad.Rec. XIV–1, 1981 FMP, p. 42–II.

10. The Hoh Tribe's coho fishery was open for 91 days in 1974. By 1977 the figure had dropped to 58 days and in 1980, to 14 days. The Washington Department of Fisheries' escapement goal, given the 1981 ocean fishery, allows for all the 1981 harvestable Hoh River coho to be taken in the ocean, leaving no harvestable fish for the treaty in-river fishery (except that the State suggested that some small evaluation fishery might be allowed to assist its management purposes).

11. In both 1980 and 1981 the Secretary's management plan for Washington north coast coho was predicated upon a system of single species aggregation intended to allow the Washington coastal tribes collectively to take 50 percent of the harvestable number of coho returning to the combined north coastal river systems. 1981 FMP, pp. 19–III, 18–IV—20–IV. This resulted in a return to some of the river systems of fewer fish than necessary to achieve both the State-established spawning escapement goal for that river and a tribal harvest of their treaty share of the run.

12. A management plan which requires that sufficient fish be allowed to escape from the ocean fishery to meet both Indian treaty allocation requirements and the State's spawning escapement goals for each run of fish on a river-system by river-system basis would require more flexible escapement goals or some further reduction below the ocean harvest levels established in the 1981 FMP. If spawning escapement goals were maintained at State-established levels and just the plaintiff tribes' rivers were considered, the ocean harvest north of Cape Falcon could be no more than 260,000 coho in 1981. If such a regime were to account for all Washington rivers, there

could be no ocean fishery north of Cape Falcon in 1981. Any such further reductions would result in additional significant transfers of fish (some of which are of Canadian or Puget Sound origin) to the Canadian fisheries and to larger returns to other United States inside waters in addition to the coastal waters involved in this case.

13. The Quillayute River summer and Quinault River fall coho runs are managed for hatchery production. All other coastal coho runs originating from the Quillayute River south through Grays Harbor are managed for natural production. 1981 FMP, p. 17–III.

14. The ocean fishery management regime is based upon pre-season forecasts of stock abundance and is designed to permit ocean commercial troll and recreational fisheries to harvest a portion of the mixed stocks that are believed present at the time of harvest. Means for accurate forecasting do not appear to have been found, but the parties are continuing to attempt to devise methods for accurate forecasting. The State has adopted fixed-number spawning escapement goals for each Washington coastal river system based upon the existing smolt production capacity of the river, with no provision for minimum harvest level for existing users.

15. The ocean harvest takes place before more accurate annual run-size data are available. Consequently, overly optimistic run-size projections act to reduce the numbers of fish available for the inside fisheries and/or spawning escapement. When spawning escapement goals are fixed, the entire burden of over-estimation of run-size projections must be borne by the tribal and other inside fisheries which must be closed or curtailed if the fixed escapements are to be met.

16. There is a need for flexibility in the management of fisheries, both in the ocean and in the rivers. Flexibility is necessary in order to make possible the 50–50 sharing result required by law with respect to treaty Indian fisheries.

17. In many instances the Secretary and WDF have built some flexibility into their management regimes with respect to meeting spawning escapement goals, in order to accommodate other management objectives. The Secretary acknowledges the flexibility of the spawning escapement goals of some salmon stocks whose ocean harvests he manages. These include stocks from the Columbia River, Oregon coastal streams, and the Sacramento and Klamath Rivers in California. 1981 FMP, Table IV–8. On those watersheds the Secretary has accepted long-term escapement goals that are phased in gradually in order to protect ocean fisheries from having to close or be further limited to meet those escapement goals in the short run. Washington has not accepted phased-in long term escapement goals for coastal runs.

18. The 1981 escapement goals included in the Secretary's plan for the Washington north coastal rivers are those proposed by the Washington Department of Fisheries. They are similar to the 1980 goals and are higher than any escapement achieved on the Quillayute, Hoh or Queets Rivers in recent years with the exception of the 1979 Quillayute and Hoh fall coho runs.

19. The evidence failed to establish that denying the plaintiffs the opportunity to harvest their treaty shares of 1981 coho runs in order to achieve the WDF escapement goals is "reasonable and necessary for the conservation of those runs" as those terms are used by the Supreme Court to determine the permissible limitations on the exercise of Indian treaty fishing rights.

20. The Court's order of May 23, 1979, in *United States v. Washington, supra,* requires the State and coastal tribes to exchange data on escapement goals and agree upon "appropriate escapement goals for natural and hatchery stocks" by January 5 of each year for summer coho and by June 1 of each year for fall coho. They are also to exchange data and reach agreement on pre-season forecasts and methods for in-season run size adjustments by February 10 and July 1 respectively and on estimates of prior interceptions by troll and sport fisher-

ies by March 15 and August 1 respectively. The plaintiff tribes have not agreed that WDF's 1981 coho escapement goals for the coastal river systems are "appropriate" or that they are necessary or desirable. This court has not determined whether the escapement goals are appropriate or inappropriate.

21. At the time of the hearing the parties believed that by the second week of August, 1981, the ocean fishery north of Cape Falcon would have taken nearly all of its 1981 coho quota. With only a small portion of the currently authorized harvest remaining uncaught as of the time of the hearing, the parties agreed that a court-ordered closure of the ocean fishery at that time would have offered very little benefit to the north coastal tribes' fisheries. Nor would such a closure have had a significant impact on any other single stock. Neither the tribes nor the State of Washington advocated a court-ordered curtailment of the ocean fishery at that point of the season.

22. The ocean commercial fishery north of Cape Falcon actually closed on August 21, 1981. The ocean recreational fishery north of Cape Falcon closed on August 26, 1981.

23. The State has offered to provide the Tribes with "Number One hatchery surplus salmon" to replace coho not available for harvest. However, the Tribes contend that such fish or carcasses are not an acceptable substitute for their treaty right to take commercially marketable fish from the rivers in the Tribes' traditional manner. They also contend that the State's proposals to implement fisheries that are selective to excess male coho or to surplus enhancement stocks are not feasible alternatives for tribal fishermen. The State has presented no evidence that such proposals would provide the Tribes with a satisfactory alternative fishery and the Court is unwilling to compel the Tribes to accept such alternative.

## CONCLUSIONS OF LAW

1. The treaty fishing rights of each of the plaintiff tribes have been authoritatively adjudicated in the case of *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash. 1974), 520 F.2d 676 (9th Cir. 1975), 459 F.Supp. 1020, 573 F.2d 1123 (9th Cir. 1978) *substantially affirmed sub nom. Washington Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), over which this Court has retained continuing jurisdiction. The interpretations of the plaintiffs' treaty right set forth in the orders and decisions in that case govern the issues in this case.

2. The Treaty of Olympia, 12 Stat. 971, secures to each of the plaintiff tribes individually and separately the right to take a share of each run of fish that passes through that tribe's fishing areas. The rule of law which governs application of the allocation provisions with respect to treaty Indian fisheries is that such allocations are generally determined separately for each run of fish on a river-system by river-system basis, but this is not an inflexible rule. If special circumstances warrant, it may be modified by an agreement among the affected parties or by specific prior judicial determination.

3. While either the Secretary or the State of Washington (or both) may, by an appropriate agreement with the affected tribes or judicial determination manage the fisheries under its jurisdiction so as to consider more than one run or one river system together for purposes of allocating the affected stocks of fish between treaty and nontreaty fishermen, the tribes, in the absence of such agreement or judicial determination, are entitled to take their harvestable share from each run of fish that returns to each of the separate river systems or waterways involved in this case. The parties should, in the development of the long-term plan which the Court here orders, attempt to develop practical and flexible rules for management of the fisheries in accordance with the Tribes' treaty rights and other applicable law.

4. The State of Washington has not established that full achievement in 1981 of its coho spawning escapement goals for the Washington north coastal river systems un-

der the conditions which exist this year with reference to the plaintiff tribes' treaty fisheries is either necessary or reasonable for preserving or maintaining those runs.

5. The State and the Secretary have not established that their present management regimes for fisheries impacting Washington north coastal coho runs are adequately designed so as to carry out the purposes of the treaty provision securing to the plaintiff tribes the right to take fish at their usual and accustomed fishing places in common with the non-Indian citizens.

6. From the evidence presented to this court full achievement in 1981 of the State's coho spawning escapement goals for the river systems and watersheds identified in Finding of Fact No. 8 herein, is not reasonable or necessary to prevent demonstrable harm to the actual conservation of fish.

7. Full achievement in 1981 of the State's coho spawning escapement goals for the river systems and watersheds identified in Finding of Fact No. 8 herein, would not provide for an opportunity for each of the plaintiff tribes to take, at their river usual and accustomed fishing places, their adjudicated share of the harvestable coho runs returning to said river systems and watersheds.

## DECLARATORY JUDGMENT AND DECREE

This judgment and decree is based upon the Pleadings, the Administrative Record before the Secretary of Commerce (hereinafter "Secretary"), the testimony before the Court, the submissions and oral argument of counsel, and the Findings of Fact and Conclusions of Law entered in this case.

It is ORDERED that:

1. The motion of the State of Washington to intervene as a defendant in this case is granted.

2. The motions of the plaintiffs and of the defendant, respectively, for summary judgment are denied.

3. The matter herein was on August 3, 1981, remanded to the Secretary with di-

rections to reconsider his plan and regulations for management of 1981 ocean salmon fisheries insofar as they affect the fishery rights of treaty fishermen of the north coast of Washington. The court instructed the Secretary to reconsider (1) the ocean harvest levels for coho salmon north of Cape Falcon, Oregon, provided for therein; (2) the State of Washington coho spawning escapement goals for north coast streams to the extent adopted therein; or (3) a combination of the above. The Secretary's Submission on Remand, filed August 7, 1981, indicated his conclusion that the ocean fishery should not be prematurely closed, but that the state's escapement goals for certain Washington streams should be relaxed to levels which allow perpetuation and some increase in escapement of the runs yet permit equal tribal harvest. The Tribes concurred in this submission, which recited also agreement that the rule of law governing treaty allocation of salmon fisheries generally is equal sharing on a river-system by river-system, run-by-run basis, but that this is not an inflexible rule. Except as specifically noted in paragraph 5 below regarding the precise spawning escapement "floor" for 1981, the court hereby approves the Secretary's submission.

4. This Court hereby orders that the treaty right of the plaintiff Tribes is a right to take approximately fifty percent of each run of salmon, managed on a river-system by river-system, run-by-run basis. The Court concludes that this rule is not inflexible and orders that departures from it shall be dealt with by agreement of the parties or by application by any party to the Court for direction or approval prior to implementation.

5. Because much of the 1981 ocean fishing on Washington coastal coho stocks has already occurred, and because it appears unlikely that each of the plaintiff tribes will have an opportunity to harvest its treaty allocations of coastal coho stocks (determined on the river-system by river-system allocation basis as adjudicated in earlier litigation and as acknowledged in the Secretary's remand submission) unless interim

relief is provided by this Court for 1981, and because the State of Washington has not shown to this Court that restriction of the river fisheries of the plaintiff tribes below their allocation entitlements in order to fully achieve the State's selected coho escapement goals for 1981, is either "necessary to the perpetuation of a particular run or species of fish," *United States v. Washington,* 384 F.Supp. 312, 342 (W.D.Wash.1974), or that "the conservation required [could not have been] achieved to the full extent necessary, consistent with the principle of equal sharing between treaty and nontreaty fishermen * * * by restriction of fishing by nontreaty fishermen or by less restrictive alternative means or methods" (384 F.Supp. at 415) as required by this Court's previous orders, this Court hereby orders that the 1981 coho fisheries of the plaintiff tribes may not be restricted on any of the river systems or watersheds listed in paragraph 10 of this decree for the purpose of obtaining a 1981 spawning escapement that is greater than 115% of the brood year (1978) escapement of the run for that river system unless the parties agree or the Court finds that the in-river run is large enough to exceed this goal and still allow equal sharing. Nor shall the State permit non-treaty sport fishing for coho, except for jacks, on any north coast stream where the tribal harvest will not reach 50 percent. Any shortfalls in the 1981 treaty harvests will be treated by equitable adjustments or as agreed by the parties or submitted to the Court. This paragraph applies to this year only and is not necessarily to be construed as a governing principle for the long-range plan to be negotiated for pursuant to paragraph 8 of this decree.

6. The court's fisheries technical advisor recommends that meaningful progress must be made towards rebuilding the coastal river coho runs in the shortest practical time to a level that will sustain an optimum viable fishery properly allocated between the treaty and nontreaty fisheries and to maximize production. To achieve this he has recommended a higher escapement floor for 1981 than that proposed by the United States and the tribes. He has recommended further that the Court adopt the State's goals as the long-term objective for spawning escapement to use as a yardstick to measure progress toward an optimum level and set a minimum of two cycles (6 years) for reaching the State's goals.

The Court agrees with the technical advisor that meaningful progress should be made toward rebuilding the coastal runs but believes that decision on the specific target and formula for achieving it is premature at this time. No evidence has been presented that the State's escapement goal is or is not the proper one to achieve optimum treaty and nontreaty harvest opportunity over an extended period of time. Other existing orders of this Court in *United States v. Washington, supra,* require the parties to exchange data on escapement goals and to agree upon "appropriate escapement goals for natural and hatchery stocks" by January 5 of each year for summer coho and by June 1 of each year for fall coho. They are also to exchange data and reach agreement on pre-season forecasts and methods for in-season run size adjustments by July 1 and on estimates of prior interceptions by troll and sport fisheries by August 1. Order, Re: Coastal Salmon Fisheries Management Schedule, May 23, 1979 in *United States v. Washington,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823. There is no evidence before the Court that agreements on any of these matters have been reached for the 1981 runs and the record shows that agreement has not been reached on such escapement goals. The Court declines at this time to adopt the State's escapement goals without further evidence as to their validity for the required purpose of perpetuating or rebuilding the runs for both treaty and nontreaty fisheries. *United States v. Washington, supra.* Conclusions of Law Nos. 29, 30, 32 & 34, 403 F.Supp. 312, 402–403.[1] The Court makes no

---

1. "29. Excepting tribes entitled to self-regulate fishing by their members (See Final Decision, pages 340–342) [includes *Quinault Indi-* *an Nation,* 384 F.Supp. at 413], the right of a treaty tribe to take anadromous fish may be regulated by an appropriate exercise of state

determination at this time as to what the spawning escapement levels should be.

The Court recognizes the merit of the technical advisor's recommendation for a phased progress plan to achieve the goals (at whatever levels) over a limited period. However, decision on the time period within which the ultimately approved escapement goals should be achieved · and the rates of progress and methods for achieving those goals should await the discussions ordered by the Court for developing a long-range plan. For the reasons set forth in paragraph 5 of this order, the 115 percent-of-brood-year-escapement level specified therein shall be used for regulating the 1981 fall coho river fisheries of the plaintiff tribes, except when the returning run is large enough to exceed this goal and still allow equal sharing.

7. Mr. Fred Olney, the fisheries technical advisor appointed by this Court to assist it in *United States v. Washington*, and any alternate advisor designated therein to serve during a period of Mr. Olney's unavailability, are hereby designated to assist the Court in like manner in this case.

8. The plaintiffs, defendant and intervenor-defendant are directed to confer and negotiate promptly and in good faith on provisions for a long-term plan for managing fisheries and fish stocks here involved. The Court's fisheries technical advisor shall

participate in these discussions. The parties shall report to the Court on or before February 1, 1982, on the results of such negotiations. If at any time any party or the fisheries technical advisor believes that a party is not diligently participating in such efforts, he may, after giving all parties notice, so advise the Court. The Court may then take such action as is deemed appropriate to foster timely progress on such negotiations.

9. In determining escapement goals, pre-season forecasts, and methods for run size adjustments for 1982 and future years for the stocks of fish subject to plaintiffs' treaty rights the State of Washington and the Indian tribes shall conform to the requirements and procedures prescribed in the relevant orders this Court entered in *United States v. Washington, supra,* and herein. The Secretary shall not adopt an ocean management plan and regulations incorporating escapement goals which do not so conform.

10. At this time it is only necessary to specify the following north Washington coastal river systems or watersheds as ones to be treated as separate systems for purposes of applying the harvest sharing rules for salmon to the treaty entitlement of the tribes who are plaintiffs in this action:

a) Quillayute River System;

b) Hoh River System;

police power. To be appropriate, such regulation must:

a) Not discriminate against the treaty tribe's reserved right to fish.

b) Meet appropriate standards of substantive and procedural due process; and

c) Be shown by the State to be both reasonable and necessary to preserve and maintain the resource. When State laws or regulations affect the volume of anadromous fish available for harvest by a treaty tribe at usual and accustomed places, such regulations must be designed so as to carry out the purposes of the treaty provision securing to the tribe the right to take fish.

\*   \*   \*   \*   \*   \*

"30. In order for a regulation to be reasonable and necessary for conservation, it must, when considered in the context of the total regulatory plan, be designed to preserve or maintain the resource.

\*   \*   \*   \*   \*   \*

"32. In order for regulations not to discriminate against treaty Indians, the Department of Fisheries' harvesting plan must provide for an opportunity for treaty Indians to take, at their off-reservation usual and accustomed fishing places, a share of the harvestable fish as set forth in the Final Decision, pages 342–343.

\*   \*   \*   \*   \*   \*

"34. The protection of the treaty rights of the Plaintiff tribes to take fish at their usual and accustomed places must be an objective of the State's regulatory policy co-equal with the preservation and propagation of fish runs for other users. Before it can restrict the treaty rights of the Plaintiff tribes to take fish at their usual and accustomed places, the State and its regulatory agencies must treat such treaty rights as an obligation and interest to be promoted in the State's regulatory, management and propagation programs."
384 F.Supp. at 402–403.

c) Queets River System;

d) Quinault River System; and

e) Grays Harbor and its watershed.

See, *United States v. Washington, supra,* 384 F.Supp. 312, 385 (Finding of Fact No. 176), 405 (definition No. 5), and 459 F.Supp. 1020, 1070 (Question 4).