**WASHINGTON CRAB PRODUCERS, INC.; Metro Trollers, Inc.; Tacoma Poggie Club; Seattle Poggie Club, a non profit association; Washington Trollers Association; Pacific Trollers Association; Puget Sound Gillnetters, a non profit Washington corporation, Plaintiffs–Appellants,**

v.

**Robert E. MOSBACHER, Secretary of Commerce, United States; State of Washington, acting through its Director of the Department of Fisheries, Defendants–Appellees.**

No. 89–35595.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1990.

Memorandum Oct. 23, 1990.

Order and Opinion Jan. 25, 1991.

---

Dennis D. Reynolds and Rebekah R. Ross, Williams, Kastner & Gibbs, Seattle, Wash., for plaintiffs-appellants.

William B. Lazarus, U.S. Dept. of Justice, Washington, D.C., Douglas M. Ancona, National Oceanic and Atmospheric Admin., Seattle, Wash., for defendants-appellees.

Before HALL, THOMPSON and LEAVY, Circuit Judges.

## ORDER

The memorandum disposition filed October 23, 1990, is redesignated as an authored opinion by Judge Leavy.

## OPINION

LEAVY, Circuit Judge:

## OVERVIEW

The eleven appellants are various commercial and recreational groups who fish off the coast of the State of Washington and land their catches in Washington ports. In 1989, they challenged the Secretary of Commerce's annual ocean harvest plan for 1988, including amendments to the 1984 Fisheries Management Plan and the implementation of emergency regulations for the 1988 ocean fishing season that were recommended to the Secretary by the Pacific Fisheries Management Council ("the Council"). They sought a declaratory judgment and a review of the administrative action.

The appellee Secretary of Commerce ("the Secretary") is responsible for approving or preparing, implementing, and enforcing fishery management plans or amendments to such plans under the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1882 (1988) ("Magnuson Act") in the Fishery Conservation Zone from 3 to 200 miles off the United States coast. 16 U.S.C. §§ 1854, 1855(g), 1811. He promulgates regulations governing this zone. The Secretary relies heavily on the statutorily-created Council for development of, and advice on, plans and the preparation of proposed regulations for the fisheries off the coasts of California, Oregon, Washington, and Alaska. *See* 16 U.S.C. § 1852(h). The Magnuson Act requires that any fishery management plan must contain the conservation and management measures that are consistent with the national standards set forth in 16 U.S.C. § 1851, the provisions of the Magnuson Act, and any other applicable law including treaties with the Indian tribes. *Hoh Indi-*

*an Tribe v. Baldrige*, 522 F.Supp. 683, 685 (W.D.Wash.1981).

The complaint in this case alleged that: (1) the Secretary did not follow the duty imposed on him by the Magnuson Act to establish ocean salmon fishing seasons with information adequate to determine if treaty/nontreaty fishers would be provided their allotted shares of runs of salmon originating in Washington streams for the 1988 season; (2) sections 1801(b)(5)(A) and 1855(a) (repealed 1983) of the Magnuson Act require the Secretary to provide sufficient information "as to the division of catch between Indian and non-Indian fishermen, and the impact of the 1988 annual harvest plan and implementing regulations upon Indian and non-Indian catches" for informed public comment on the impact of the proposed ocean salmon fishing seasons on the allocation of fish between treaty/nontreaty fishers; and (3) the Magnuson Act requires the Secretary to obtain and review data on the allocations of fish between treaty and nontreaty fishers on the Pacific coastal rivers (hereafter "inside fisheries") before issuing the regulations for the ocean harvest.

The Secretary's alleged failure to establish the Pacific Ocean salmon fishing seasons with sufficient information from the other fisheries to determine whether the 1988 ocean fishing season would provide treaty/nontreaty fishers with their allotted shares of runs of salmon originating in Washington streams is the *sine qua non* of this case.[1]

We find nothing in the Magnuson Act or any related amendments or regulations that requires the Secretary to obtain and use information regarding the allocation of fish between treaty Indians and non-Indians in other fisheries before issuing the 1988 ocean harvest plan. We therefore affirm the district court's summary judgment in favor of the Secretary.

## DISCUSSION

*Standard of Review*

■ A grant of summary judgment is reviewed de novo. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986).

The parties differ as to the method by which this court should review the challenged administrative actions of the Secretary. The appellants contend the appropriate standard of review is de novo, citing 5 U.S.C. § 706(2)(C) and (D) (West 1988); *Kelley v. Calio*, 831 F.2d 190 (9th Cir.1987); and *Washington Trollers Ass'n v. Kreps*, 645 F.2d 684 (9th Cir.1981) (*Kreps II*). The Secretary contends we may examine the Secretary's action only for reasonableness and may not overturn the action unless it was arbitrary, capricious, or an abuse of discretion.

■ Section 305(d) of the Magnuson Act, 16 U.S.C. § 1855(d), specifies Congress' mandate for judicial review of the implementation of fishery management plans:

Regulations promulgated by the Secretary under this chapter shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of title 5 ... except that ... the appropriate court shall only set aside any such regulation on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.[2]

This court has stated

A court, acting under authority granted by the [Magnuson Act], may review regulations promulgated by the Secre-

---

1. The appellants state "[t]he sole thrust of our challenge is that the Secretary of Commerce has failed to determine the allocation impacts of his decision making on Indian, non-Indian allocations." Supplemental Affidavit of Gary Graham, Excerpt of Record (ER) at 121 (No. C88-671).

2. 5 U.S.C. § 706(2) states that the reviewing court shall:

hold unlawful and set aside agency action, findings, and conclusions found to be

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law. . . .

tary of Commerce, and the [Magnuson Act] provides for the standard of judicial review [in] 16 U.S.C. § 1855(d). However, unless the Secretary acts in an arbitrary and capricious manner in promulgating such regulations, they may not be declared invalid. Section 1855(d); 5 U.S.C. § 706(2)(A).

*Alaska Factory Trawler Ass'n v. Baldridge* [sic], 831 F.2d 1456, 1460 (9th Cir. 1987). This court defers to the interpretation of a statute by the agency charged with administering it. *Southern Cal. Edison Co. v. F.E.R.C.*, 770 F.2d 779, 782 (9th Cir.1985). Further, the standard of review under 5 U.S.C. § 706(2) presumes the agency action to be valid. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Our only function is to determine whether the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983). This determination is based on a "review [of] the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706(2).

■ Consequently, under section 305(d) of the Magnuson Act, de novo review of the Secretary's decision is not required.[3] We review the Secretary's action only for reasonableness. *See State of Maine v. Kreps*, 563 F.2d 1052, 1055 (1st Cir.1977) (where the Secretary has substantial discretion in the exercise of his management authority under the Magnuson Act, "[a] reviewing court may decide only whether this discretion was exercised rationally and consistently with the standards set by Congress and may not substitute its own judgment ... for that of the Secretary") (citation omitted); *Pacific Coast Fed'n v. Secretary of Commerce*, 494 F.Supp. 626, 628 (N.D.Cal.1980) ("The [c]ourt need decide only whether the Secretary could reasonably have concluded that the Plan was lawfully adopted by the Council; if so, the [c]ourt's inquiry is ended, regardless of whether a more detailed plan would be desirable.").

## Whether the Secretary Mischaracterizes What the Appellants Are Requesting

The appellants claim the Secretary mischaracterizes their claim and therefore avoids the substantive issues on appeal. We do not agree with this assertion. What the appellants really want is an analysis by the Secretary of how allocations actually work in practice in fisheries other than the ocean, to determine the impact of the proposed ocean regulations on overall allocations.[4]

According to the appellants, without an accounting of how allocations work in practice in fisheries outside the ocean, the "ocean seasons continue to be adopted without a proper regard or understanding of their impact upon Indian, non-Indian allocation of Washington coastal origin salmon." Affidavit of Gary Graham, ER at 3 (No. C88–671). Therefore,

---

3. The cases the appellants cite do not support de novo review. *Calio* stands for the proposition that an agency may not violate its own rules; it does not hold that under the Magnuson Act, a court's review of regulations is de novo pursuant to 5 U.S.C. § 706(2)(C) & (D). *Calio*, 831 F.2d at 191–92. *Kreps II* does not discuss, much less decide, an appropriate standard of review. 645 F.2d 684.

4. The second amended complaint states: "Specifically, the plan and regulations do not contain allocation information or analysis necessary to determine whether they comply with federal Indian fishing treaties *or provide for proper allocation of the ocean salmon fishery between Indian and non-Indian users.*" Second

Amended Complaint, ER at 163 (No. C88–671) (emphasis added).

The appellants state as an issue whether the Magnuson Act "imposes a duty upon the [Secretary] to establish Pacific Ocean salmon fishing seasons with adequate information to determine whether the season will provide treaty/nontreaty fishers their allotted shares of runs of salmon originating in Washington streams." Appellants' Brief at 1. They also state: "the Secretary of Commerce must analyze the impact of a proposed fishery management plan on the allocation of the Pacific salmon fishery between treaty Indian and nontreaty fishers, and must make such analysis available to the public." Appellants' Reply Brief at 1.

the Council has not managed the ocean fishery to achieve a proper sharing of Washington coast origin salmon runs between Indian and non-Indian fishermen. This is not an unexpected result, because the [Council] has not prepared or compiled allocation information, Indian and non-Indian, since prior to the 1985 season, and has not managed to achieve mandated allocations.

... [I]t is apparent that non-Indian fishermen, recreational and commercial have not been afforded sufficient ocean fishing opportunity to achieve the allowable non-Indian catch of Washington coastal origin salmon. *The only way to increase non-Indian opportunity on Washington coastal origin salmon is to extend the non-Indian fishing season in the ocean.*

*Id.* at 4 (emphasis added).

One of the appellants, the Washington Trollers Association, prepared its own analysis for certain Washington river systems (the Grays Harbor, Quinault, Queets, Hoh, and Quillayute Rivers) to determine the approximate allocations that occur in non-ocean fisheries. The results of their study show that in 1985, 1986, and 1987, treaty Indian fishers took a far greater percentage of salmon (chinook, coho, sockeye, and chum) than their non-Indian counterparts on those rivers. *See* Attachment to Graham Affidavit, ER at 7–12, 27–29. This is the kind of specific information the appellants want the Secretary to consider before he regulates the ocean seasons. Ultimately, the appellants want the ocean regulations to allow them to make up in ocean fishing for their share of the catch allegedly lost to the Indians on the inside fisheries by extending the ocean fishing season.

The Secretary maintains he is not required to analyze the impact of the ocean regulations on the allocations for inside fisheries: "no authority ... impose[s] a specific duty on the Secretary to develop a precise preseason analysis of the expected impacts of the ocean salmon regulations on treaty Indian/non-Indian sharing in fisher-

ies within the jurisdiction of other management entities." Appellee's Brief at 27.

Both the district court and the Secretary relied heavily on the affidavit of Dr. Kenneth A. Henry, a fisheries biologist who has worked with salmon research for at least forty years and who is the chair of the Council's Salmon Technical Team. Under the Magnuson Act, the Council and the Salmon Technical Team are responsible for developing fishery management plans and amendments to manage the commercial and recreational ocean salmon fisheries in the fishery conservation zone between three and two hundred miles off the coasts of Washington, Oregon, and California.

Dr. Henry explains that under the Magnuson Act, the fisheries are currently managed under a "framework" fishery management plan that the Secretary approved in 1984. The implementing regulations at 50 C.F.R. Part 661 provide the mechanism for making annual preseason and in-season adjustments to ocean salmon management regulations, within limits set by the fishery management plan, by notice in the *Federal Register.*

According to Dr. Henry, management of the ocean fisheries is complicated by the fact that there are various agencies responsible for the salmon depending upon where the fish are found. The United States Department of Commerce has jurisdiction over the three to two hundred mile "exclusive economic zone" (EEZ) off the coast of the United States. From zero to three miles offshore, the States of Oregon and California have jurisdiction over their territorial waters, and the State of Washington has jurisdiction within its territorial waters and its inland waters. The treaty Indian tribes have jurisdiction within their reservations and their adjudicated "usual and accustomed" fishing places. The National Park Service has jurisdiction within the boundaries of the Olympic National Park. Coordination among each of these managers "is essential to protect the resource and achieve objectives for harvest distribution." Affidavit of Kenneth A. Henry, ER at 145 (No. C88–671) (hereafter Henry).

Dr. Henry explains that in developing recommendations for ocean salmon harvest regulations, the Council operates under the general processes and guidelines set forth in 50 C.F.R. Part 661 in the Framework Plan Amendment. The first objective and most significant aspect of the Framework Plan is to "establish ocean harvest rates for commercial and recreational fisheries that are consistent with requirements for optimum spawning escapements, treaty obligations, and continuance of established recreational and commercial fisheries within the constraints of meeting conservation and allocations objectives." *Id.* at 36. A major concern is negotiating coordinated fishery regimes with the tribal and state managers. Of critical importance to the negotiations is the management of weak stocks [5] where the total run size in some instances has been insufficient to meet established spawning escapement objectives absent *any* fishing of these stocks.

In establishing regulations for the ocean fisheries, the evidence shows that the Council and the Secretary take into account the impact of fisheries conducted and regulated by the other management entities. The Secretary must ensure that the ocean fisheries are regulated

so as not to preclude the opportunity for other management entities to achieve appropriate treaty/nontreaty allocations to the extent practicable while meeting conservation objectives. For all but the weakest stock, the Secretary must rely upon management by other entities to achieve conservation requirements and allocation obligations.

*Id.* at 39–40. Moreover,

under current court decisions, these fisheries are constrained by the status of the weakest stock.... It is therefore simply not possible to take the full nontreaty share of each and every stock in the ocean fisheries. In fact, under weakest stock management, it is virtually impossible to take the full nontreaty share of any stock in the ocean except the weak-

est stock. Harvestable fish from stronger stocks will inevitably escape ocean fisheries and achievement of appropriate sharing must depend upon the regulation of inside fisheries.

*Id.* at 40–41. Finally,

Any increase in nontreaty ocean harvest quotas subject to the Secretary of Commerce's jurisdiction would necessarily require further reduction in escapements for some stocks already anticipated to be returning below minimum escapement objectives or reductions in inside fisheries subject to the exclusive regulatory authority of the states and tribes.

*Id.* at 43.

We find that the Secretary answers the appellants' challenge by explaining the objectives of the Magnuson Act and its regulations, the constraints on his jurisdiction, and how the appellants' goals appear from the vantage point of what the Secretary must accomplish under the Magnuson Act. Seen in this light, we do not find the Secretary has mischaracterized the appellants' request. Our next task is to determine if the Secretary's interpretations are reasonable.

*Whether the Secretary's 1988 Ocean Harvest Plan and Regulations Are Consistent with the Allocations Required by the Stevens Treaties*

■ According to the appellants, 16 U.S.C. § 1853(a), the case law, and the applicable regulations require the Secretary, in formulating the ocean harvest plans and implementing regulations for each season, to account for inland catches by Indians and non-Indians of runs originating in Washington coastal streams. The thrust of the appellants' argument is that the salmon resource must be considered as a whole in planning the ocean harvest so that the treaty and nontreaty fishers receive their fair share of the ocean harvest.

The appellants have four arguments why the Secretary must take into account data

5. The weakest stock is the stock that can sustain the lowest harvest rate necessary to meet spawning escapement requirements, legal obli-gations such as treaty Indian fishing rights, and provide for inside fisheries.

on catches from the inland fisheries by treaty Indians. Each is discussed below.

### A. Whether a Non–Discretionary Duty Is Imposed by Section 1853(a)

First, it is claimed the Secretary has a nondiscretionary duty under 16 U.S.C. § 1853(a)[6] to make allocations for the ocean salmon harvest that are consistent with the Stevens Indian Treaties. This court has held that "other applicable law" referred to in section 1853(a)(1)(C) includes the Stevens Treaties. *Washington State Charterboat Ass'n v. Baldrige*, 702 F.2d 820, 823 (9th Cir.1983), *cert. denied*, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 194 (1984).

Litigation in the 1970s over the Stevens Treaties resulted in the holding that "treaty fishers have a right to a share of each run of anadromous fish that passes through the 'usual and accustomed' Indian fishing sites." *Id.* at 821 (footnote omitted) (citing *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 684, 99 S.Ct. 3055, 3073, 61 L.Ed.2d 823 (1979)). This court held that the Magnuson Act did not abrogate the Stevens Treaties, and that these treaties require the allocation of the salmon harvest on a run-by-run approach, rather than an aggregate approach, even in the ocean. *Id.* at 822–24.

In ruling against the argument that the Secretary has a nondiscretionary duty, the district court stated:

> [E]ssentially plaintiffs are claiming that the Secretary did not develop, evaluate and consider the expected impact of the ocean salmon regulations on the allocation of treaty Indian/non-Indian catch

sharing in fisheries within the jurisdictions of Washington, Oregon and California prior to the issuance of the emergency regulations as required by the Magnuson Act and the regulations issued to implement the Magnuson Act.[7]

Decision on Motion for Summary Judgment, ER at 222 (No. C88–671) (hereafter Summary Judgment). The court held that "neither the Magnuson Act nor the regulations require, or as characterized by plaintiffs, impose a non-discretionary duty, to develop or obtain this information pre-season." *Id.* at 224. The court found that section 1853(a)(1)(C) is a "general statement of purpose and intent" regarding fishery management plans and "cannot be construed to impose the very specific obligation on the Secretary plaintiffs seek to impose." *Id.* at 226.

The district court is correct. There is nothing in the section that requires the Secretary either to consider past catch disparities in other fisheries so as to make up any allocation imbalance in the ocean harvest, or to analyze the expected sharing impacts of the 1988 ocean harvest season proposals. Rather, section 1853(a) requires that the fishery management plan shall "contain the conservation and management measures ... consistent with ... other applicable law." 16 U.S.C. § 1853(a)(1)(C). To conserve and manage the salmon resource, the Secretary must work in coordination with spawning escapement goals set by the states, *see Hoh*, 522 F.Supp. at 692, "to insure that salmon in sufficient numbers return to each region or each river system ... to allow treaty fishermen a fair opportunity to harvest their shares."

---

**6.** In relevant part, 16 U.S.C. § 1853(a) makes it a "Required provision" that:

> Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—
> (1) contain the ... management measures ... which are—
> ....
> (C) consistent with the national standards, the other provisions of this chapter, and any other applicable law.

**7.** This is a fair characterization of what the appellants want. In their brief on appeal, the

appellants state: "[N]o analysis, either of past catches or *expected sharing impacts of 1988 season proposals, was prepared.* In fact, since 1985, the [Council] has not prepared or compiled any pre-season *predictions* of allocation effects *of its actions.*" Appellants' Brief at 11 (citations omitted) (emphasis added).

> In other words, in actual effect, if the ocean fishing season were not lengthened, the appellants could not receive their fair share of fish since the Indians were catching more than their fair share in the inland fisheries.

*United States v. Washington*, 459 F.Supp. 1020, 1070 (W.D.Wash.1978), *aff'd*, 645 F.2d 749 (9th Cir.1981).

Applicable law on conservation and management holds that "[n]either the Indians nor the non-Indians may fish in a manner so as to destroy the resource or to preempt it totally." *Hoh*, 522 F.Supp. at 686. That is why the ocean fishery management regime is based upon pre-season forecasts of stock abundance, *see id.* at 688, rather than an analysis of past catch or expected catch disparities in allocations between Indians and non-Indians. The Secretary's emphasis, then, must be on spawning escapement, which would necessarily be reduced if he were to lengthen the ocean season to make up for past catch disparities in favor of treaty fishers in the inland fisheries.

Given this goal, the Secretary's interpretation of his duties under section 1853(a) is reasonable.

### B. Whether Compliance with Treaty Allocations Is a Responsibility of Federal Managers

The appellants contend that compliance with the treaty allocations is the responsibility of federal, as well as state, managers. They cite the part of the Magnuson Act that gives the national standards for fishery conservation and management: "To the extent practicable, an individual stock of fish shall be managed as a unit *throughout its range*, and interrelated stocks of fish shall be managed as a unit or in close coordination." 16 U.S.C. § 1851(a)(3) (emphasis added). They also rely on the Supreme Court holding that fish "taken in Washington waters or in United States waters off the coast of Washington ... by either members of the Indian tribes ... or the non-Indian citizens of Washington ... shall count against that party's respective share of the fish," *Fishing Vessel*, 443 U.S. at 689, 99 S.Ct. at 3076; that "[s]hares in the fish runs should not be affected by the place where the fish are taken," *id.* at 687, 99 S.Ct. at 3075; and that the Magnuson Act "clearly place[s] a responsibility on the United States, rather than the State, to

police the take of fish in the relevant waters by Washington citizens insofar as is necessary to assure compliance with the treaties." *Id.* at 688, 99 S.Ct. at 3076.

The district court found there was nothing here to impose the very specific obligation on the Secretary that the appellants want. The court instead suggested that agreements among the affected parties are desirable where there is no inflexible rule for a fifty-fifty allocation of fish:

> "While ... the Secretary ... may, by an appropriate agreement with the affected tribes or judicial determination manage the fisheries under its jurisdiction so as to consider more than one run or one river system together for purposes of allocating the affected stocks of fish between treaty and nontreaty fishermen, the tribes, in the absence of such agreement or judicial determination, are entitled to take their harvestable share from each run of fish that returns to each of the separate river systems or waterways involved.... The parties should, in the development of the long-term plan which the [c]ourt here orders, attempt to develop practical and flexible rules for management of the fisheries in accordance with the Tribes' treaty rights and other applicable law."

Summary Judgment, ER at 225–26 (quoting *Hoh*, 522 F.Supp. at 689).

In the absence of a specific statutory requirement, to force the Secretary to analyze catch disparities in jurisdictions outside of his own and thereby submit to the inevitable battles over longer ocean fishing seasons does not comport with the spirit of agreement the *Hoh* court tried to achieve.

Moreover, to say, as the Supreme Court did in *Fishing Vessel*, that fish wherever caught shall count in the allocation process is not to say that a between-jurisdiction accounting process is required or that an anticipated disparity may be overcome by allowing extra fishing in one jurisdiction. The former, not the latter, is the holding of *Fishing Vessel*. *See* 443 U.S. at 687–89, 99 S.Ct. at 3075–76.

Finally, the Secretary does not dispute that a run-by-run approach is law he must

apply in allocating fish. The record shows he does consider treaty requirements and the available preliminary assessment of the needs of the inside fisheries. However, he does not agree that he be provided with data or analysis of treaty and nontreaty harvest shares for *each salmon stock* before a plan is issued. *See* Henry Affidavit, ER at 40–41, (explaining that the ocean fisheries are constrained by the status of the weakest stock and that therefore, it is "simply not possible to take the full nontreaty share of each and every stock in the ocean fisheries"). Instead, the ocean harvest is allocated to treaty and nontreaty shares and sufficient fish are allowed to escape to the inside fisheries, where the proper treaty/non treaty allocations are the responsibility of the other management entities.

Consequently, the Secretary's interpretation of his duties to comply with the treaty allocations under the Magnuson Act and the applicable cases is reasonable.

### C. Whether the Framework Plan Regulations or Appendix Supports the Claim of Defects in the Issuance of the 1988 Ocean Harvest Regulations

The appellants maintain the Framework Plan requires the fishery management plans and implementing regulations to be consistent with the treaty allocations. The implication of this argument is that the Framework Plan in some way requires the Secretary to consider disparities in allocations in the inside fisheries and to adjust for them in the ocean harvest season.

The Framework Plan is implemented by regulations codified at 50 C.F.R. Part 661 (1989). These regulations authorize the setting of treaty Indian seasons and quotas, 50 C.F.R. § 661.20(a)(4),[8] and incorporate provisions regarding treaty fishing

seasons and the allowable treaty catches and quotas in an appendix. § 661.20(b). The appendix requires the Secretary to "establish or modify treaty Indian fishing seasons and/or fixed or adjustable quotas ... taking into account recommendations of the [Council], proposals from affected tribes, and relevant Federal court proceedings." 50 C.F.R. Part 661 app. at IIB10(a). The appendix also states:

> The combined treaty Indian fishing seasons will not be longer than necessary to harvest the allowable treaty Indian catch, which is the total treaty harvest that would occur if the tribes chose to take their total entitlement of the weakest stock in the fishery management area, assuming this level of harvest did not create conservation or allocation problems on other stocks.

*Id.* at IIB10(b). Further,

> Any fixed or adjustable quotas established will be consistent with established treaty rights and will not exceed the harvest that would occur if the entire treaty entitlement to the weakest run were taken by treaty Indian fisheries in the fishery management area.

*Id.* at IIB10(c).

The Secretary cogently argues why the appellants' reliance on the procedures in the appendix is misplaced. First, he quotes Dr. Henry to explain that the procedures described in the appendix are relative to *ocean fishing only*:

> [T]he procedures described in the Appendix are followed by the Salmon Technical Team relative to *ocean* fishing regimes and escapement from *ocean* fisheries to terminal areas, including evaluation of treaty Indian/non-Indian sharing (to the extent to which catches within the management jurisdiction of the [Council] are subject to such sharing requirements) and consideration of anticipated

---

**8.** § 661.20(a)(4) provides that

The Secretary will annually establish or, as necessary, adjust management specifications for the commercial, recreational, and treaty Indian fisheries by publishing a notice in the *Federal Register* under § 661.23. Management specifications may include allowable ocean harvest levels (including quotas), allocations, manage-

ment boundaries and zones, minimum size limits, gear definitions, seasons, selective fisheries, and inseason notice procedures for each fishery and may be specified as follows

. . . .

(4) *Treaty Indian Fishing.* (i) Area, season, fixed or adjustable quotas, species, zone, and gear restrictions.

fishing rates and regimes in other *ocean* fisheries. Specifically, preseason abundance forecasts are made for each stock based upon the best available forecasting techniques, and are consistent with preseason abundance forecasts made to establish preseason management plans for fisheries inside state waters. Fishing rates are adjusted to reflect anticipated regulations in *ocean* fisheries in Canada, Washington, Oregon and California. Ocean escapements (adult terminal run sizes) for coho are estimated, as if there were no prior ocean fishery, using the coho micro-computer model derived from the Washington Department of Fisheries/National Bureau of Standards model.

Appellee's Brief at 29 (quoting Henry, ER at 151) (citation omitted). Dr. Henry further explained:

> Treaty Indian and non-Indian harvest impacts in the *ocean* fishery are then established by quotas proposed by the [Council]. Using the Council quotas, treaty Indian and non-Indian harvest shares for the *ocean* fisheries for critical stocks are available from the model output and depend on the shape of the fisheries. *Normally, specific provisions for fishery needs inside state waters are not taken into account by the Salmon Technical Team because specific fishing seasons in state waters are not determined by the state and tribes until after the Council has met in April of each year and adopted ocean regulations.*

Henry, ER at 151–52 (emphasis added in last sentence.) Thus, the Secretary interprets the appendix to provide procedures for *ocean* fishery management measures, not as procedures requiring an accounting for what occurs on the inside fisheries.

Second, the appendix requires the Secretary only to make preseason abundance forecasts for each stock "consistent with" the state regulations of inside fisheries:

> Preseason abundance forecasts will be made for each stock based upon the best available forecasting techniques and consistent with forecasts made to establish preseason management plans for fisheries inside state waters.

50 C.F.R. Part 661 app. at IIB(b). The Secretary explains: "this statement refers to preseason abundance forecasts for the *ocean* fisheries ... and the importance of making those forecasts consistent with preseason abundance forecasts for inside fisheries.... Neither the [Council] nor the Secretary is required by the Appendix to issue regulations according to the actual allocations for inside fisheries, contrary to [appellants'] assumption." Appellee's Brief at 30–31.

Third, regarding *ocean* fishing rates, the appendix states the Washington Department of Fisheries/National Bureau of Standards model fishing rates "will be adjusted to reflect anticipated regulations and exploitation rates associated with fisheries in Canada, Washington, Oregon, and California." App. IIB(b). Again, the appendix does not require the ocean fishing rates be adjusted to correspond with catch levels in inside fisheries.

Finally, the appendix states: "[t]reaty Indian and non-Indian harvest shares will be computed for each appropriate stock." *Id.* Once more, according to Dr. Henry, this refers to the ocean fishery:

> Treaty Indian and non-Indian harvest impacts in the *ocean* fishery are then established by quotas proposed by the [Council]. Using the Council quotas, treaty Indian and non-Indian harvest shares for the *ocean* fisheries for critical stocks are available from the model output and depend on the shape of the fisheries.

Henry, ER at 151–52.

■ There is no clear mandate for what the appellants ask in the Magnuson Act, the regulations, or the appendix. We are mindful of the deference typically accorded to an agency's construction of its own enabling legislation and regulations. *See, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). This deference is particularly appropriate where the resource to be managed and the act, regulations, and case law are complicated, thus calling for agency expertise. *See Papago Tribal Util. Auth. v. F.E.R.C.,* 773 F.2d 1056, 1058 (9th Cir.1985) (courts defer to an agency's sub-

stantial expertise where the subject matter is complex), *cert. denied*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 913 (1986). We find the Secretary's interpretation reasonable.[9]

### D. Whether an Allocation Analysis Is Necessary to Decide If Proper Allocation Is Precluded

The appellants argue that an allocation analysis is needed to determine if the harvest plan will "preclude" proper allocation. They maintain that in the total absence of analysis of impacts of the ocean regulations on the entire runs, it is not possible for the Secretary to assure that proper allocations for the ocean are not precluded.

There are two problems with this argument. The first is that there is no requirement that inside fishery data be analyzed to properly allocate the ocean harvest. The second is that the Secretary did analyze the impacts of ocean harvest on *escapement* from the ocean for spawning and inside fisheries, using the best available estimates of abundance of the weakest runs. Admin. Record, Table I.4, at 8–17. The concern with escapement is paramount, because escapement is a measure of how many fish may return to the rivers to spawn and be harvested there, which is a major purpose of the Magnuson Act. *See* 16 U.S.C. § 1851(a)(1) ("Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the ... fishing industry."); *Hoh*, 522 F.Supp. at 686. The Magnuson Act was concerned, among other things, with overfishing and the inadequacy of fishery management and

conservation measures. 16 U.S.C. § 1801(a)(2).

The district court correctly upheld the Secretary's action as consistent with his duty under the Magnuson Act, 16 U.S.C. § 1851(a)(2).

### Whether There Was an Opportunity for Informed Public Comment

The appellants discuss the fact that informed public comment is required under the Magnuson Act. However, the appellants do not reveal exactly what their problem was in 1988 with respect to public comment. They probably suggest that they could not be properly informed unless they knew from the Secretary how allocations actually work in practice in fisheries other than the ocean, to determine the impact of the proposed ocean regulations on overall allocations. *See* Second Amended Complaint, ER at 164 ("Without adequate information as to the division of catch ... it is impossible for the public ... to have a meaningful voice in shaping ... plans and regulations...."). The conclusion that no such accounting is required disposes of this argument.

### Whether the 1988 Fishery Management Plan Was Not Based on the Best Scientific Information Available

The appellants cite a national standard for fishery conservation and management that they claim was not met. The standard states: "Conservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).[10] They claim the Secretary failed to use a computer model that can analyze the effects of fishing at various stages of the life history of the runs, so as

---

**9.** Contrary to the appellants' assertion, the district court did not find the appendix to be of less weight than the regulations in reaching its decision. Rather, the court observed that the appendix provides a guide in applying the regulations. Summary Judgment, ER at 230. More significantly, the court found, as we do also, that the appendix governs the *ocean* harvest and that it does not require preparation of analysis of inside stocks.

**10.** The Secretary states the appellants cannot bring this claim now, because they did not cite this provision to the district court, "in their

complaint or otherwise." This is not true. The complaint states:

> The 1988 annual harvest plan and its implementing regulations are not shown to have the information needed to be consistent with the national standards established by the Magnuson Act.

Second Amended Complaint, ER at 163. A fair interpretation of this cause of action encompasses 16 U.S.C. § 1851(a)(2), which is a national standard. Moreover, the district court mentions this standard in its opinion, although it is not discussed at length. Summary Judgment, ER at 226.

to prepare an accounting of the allocation effects of inside fisheries.

This argument suffers from the same defects described previously. There simply is no requirement that the Secretary do what the appellants insist. Further, the record supports the Secretary's assertion that the information necessary to the analysis the appellants seek is unavailable at the time of the Secretary's decision, because inside fishery planning is completed *after* development of ocean regulations.

## CONCLUSION

■ We affirm the Secretary's promulgation of regulations for the 1988 ocean harvest season. We must defer to the interpretation of a statute by the agency charged with administering it. *Southern Cal. Edison Co. v. F.E.R.C.*, 770 F.2d 779, 782 (9th Cir.1985). The Secretary's interpretation of his duties and obligations are reasonable in that he "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983).

We are not misled by the appellants' insistence that the Secretary has mischaracterized their arguments, and that all they are after is an accounting of the allocations between Indian and non-Indian fishers. The record demonstrates that the appellants ultimately want to force a longer ocean fishing season to make up for alleged catch disparities. As the Secretary has explained, his concern is with adequate escapement to perpetuate the various salmon species to enable the industry and sport to continue, and in particular, to see that the Indians get their allocated share in accordance with the treaties. Given this stated objective, the Secretary was correct to respond to this complaint as he did.

AFFIRMED.