SOUTHEASTERN FISHERIES ASSOCI-
ATION, INC., and National Fisher-
ies Institute, Inc., Plaintiffs,

v.

Robert A. MOSBACHER, Secretary, Unit-
ed States Department of Commerce, J.
Curtis Mack, Acting Administrator, Na-
tional Oceanic and Atmospheric Ad-
ministration, United States Department
of Commerce, and William E. Evans,
Assistant Administrator for Fisheries,
National Oceanic and Atmospheric Ad-
ministration, Defendants,

and

Coastal Conservation Association and
State of Florida, Defendant–
Intervenors.

Civ. A. No. 86–1948 SSH.

United States District Court,
District of Columbia.

Aug. 6, 1991.

Eldon V.C. Greenberg, Garvey Schubert & Barer, Washington, D.C., for plaintiffs.

Michelle Kuruc, Wildlife and Marine Resources Div., Donald A. Carr, Land and

Natural Resources Div., Washington, D.C., for Department of Justice.

Craig O'Connor, Andy Kemmerer, St. Petersburg, Fla., for National Marine Fisheries Service.

Jay S. Johnson, Asst. Gen. Counsel for Fisheries, Washington, D.C., for National Oceanic and Atmospheric Admin.

James W. Sloan, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Charles R. McCoy, Asst. Gen. Counsel, Dept. of Natural Resources, Tallahassee, Fla., for State of Fla.

Robert G. Hayes, Jeffrey R. Masi, Washington, D.C., for Coastal Conservation Ass'n.

## OPINION

STANLEY S. HARRIS, District Judge.

Plaintiffs filed this action challenging certain provisions of the Secretarial Fishery Management Plan for the Red Drum Fishery of the Gulf of Mexico, as amended by Amendment Number One, and its implementing regulations. On July 31, 1990, the Court dismissed that portion of Count One which addressed the directed redfish fishery. Now before the Court are plaintiffs' motion for summary judgment and the cross-motions of the defendants and defendant-intervenors. For the reasons set forth below, each party's motion is granted in part and denied in part.

1. The internal waters of the states are those brackish waters (*e.g.,* bays and rivers) shoreward of the states' baselines. As for the territorial seas, for Mississippi, Louisiana, and Alabama, they extend three miles from the states' baselines. The territorial waters of the Gulf Coasts of Florida and Texas extend three leagues (approximately nine miles) from the baseline.

The EEZ, formerly known as the Fishery Conservation Zone, extends seaward from the seaward boundary of the states' territorial sea to a distance of 200 nautical miles, measured from the baseline.

2. "Redfish" and "red drum" are used interchangeably throughout the administrative record.

## Background

The Gulf of Mexico red drum fishery encompasses the internal waters and territorial seas of the Gulf states, and the Exclusive Economic Zone (EEZ).[1] Redfish spawn in the estuaries of the Gulf of Mexico, and the juvenile fish mature in the bays and territorial seas.[2] As they reach sexual maturity, they migrate offshore to deeper waters where they live for most of the remainder of their lives, returning annually to the estuaries to spawn before returning again to deeper waters. Redfish are a long-lived species and, thus, are particularly susceptible to increases in fishing mortality.

Prior to 1984, most of the commercial and recreational redfish harvest occurred in state waters, and the fishery was primarily recreational.[3] As a result, there was no federal regulation and little state regulation of the fishery. However, in the early 1980's, cajun cuisine became popular and the demand, and, consequently, the price, for what ultimately would become "blackened redfish" increased rapidly. As a result, a commercial purse seine fishery for large redfish developed quickly in the EEZ.[4] Historic harvest levels of the spawning stock in the EEZ prompted a work group of state, federal, and academic fisheries scientists to conclude that recruitment overfishing was a real possibility.[5] While the potential for harm was recognized, the degree of the potential harm was unknown.

3. In 1980, less than 50,000 pounds of redfish were harvested in the EEZ. In 1986, the EEZ catch was 8.1 million pounds.

4. Purse seine nets are used to encircle a school of redfish and then are tightened like a purse and hauled onto the fishing vessel. This method is particularly effective when harvesting redfish, because large numbers of them school and swim close to the surface, making them easily visible from spotter planes working in conjunction with fishing vessels.

5. Recruitment overfishing occurs when the spawning stock is reduced to a level too low to assure adequate levels of young fish. This can occur through overfishing of adult spawners or juvenile fish, or a combination of both.

Under the Magnuson Fishery and Conservation Act (MFCA), 16 U.S.C.A. § 1801 *et seq.*, the federal government has exclusive authority over fishing in the EEZ. Pursuant to the MFCA, Regional Fishery Management Councils, established through cooperative action of the states and the federal government, develop fishery management plans (FMPs) with respect to those stocks requiring conservation and management. The FMPs are then submitted to the Secretary of Commerce for approval. Once an FMP is approved, the Secretary promulgates regulations for its implementation. Alternatively, if the Regional Council fails to act, the Secretary may develop his own FMP. In addition, the MFCA authorizes emergency regulations when time does not permit implementation of the full procedure. Finally, an FMP may be amended as necessary.

Prior to 1986, the Gulf of Mexico Fishery Management Council, the Regional Council vested with authority for developing FMPs for Gulf resources, had not developed an FMP for redfish.[6] Based on the growth of the fishery and scientific observations pertaining thereto, and at the request of plaintiffs and others, the Secretary decided to prepare an FMP for redfish in the Gulf. However, to provide for protection in the interim, emergency regulations were issued on June 30, 1986, for an effective period of 90 days. The regulations established a one-million-pound quota for the harvest of redfish in the EEZ and preserved the landing and possession laws of the Gulf states.[7] In addition, the Secretary initiated a Secretarial Plan that would permanently replace the emergency regulations. He also established a scientific research program to assess the health and future of the stock.

On September 26, 1986, with the concurrence of the Gulf Council, the Secretary extended the emergency regulations for an additional 90 days. However, the regulations were modified to prohibit the retention of redfish taken from the EEZ by all persons.

After a period of review and comments, on December 24, 1986, defendants announced the completion of the Secretarial FMP and issued final implementing regulations. The Secretarial FMP and regulations provided for a ban on harvesting redfish in the directed commercial fishery in the EEZ in 1987, with an annual review of commercial quota levels based on an assessment of offshore stock thereafter. The Secretarial FMP also allowed for an incidental by-catch of 100,000 pounds in the indirect redfish fishery and superseded the states' landing and possession laws for the purpose of landing the by-catch.[8] It established a recreational bag limit of one red drum per person per trip in the EEZ, subject to state landing and possession laws if those laws were more restrictive. Finally, the regulations established a scientific program and a licensing scheme for the by-caught fish.

While the Secretary was preparing the Secretarial FMP, the Gulf Council began the preparation of an Amendment to the FMP. After a review and comment period, the Gulf Council adopted the Amendment in its final form on April 30, 1987, and submitted it to the Secretary for formal review on May 20, 1987. After another review and comment period, the Secretary approved the Amendment (Amendment One) in its entirety on August 28, 1987, and issued implementing regulations on September 16, 1987. The regulations (1) divided the EEZ in the Gulf into a primary area

---

**6.** The Gulf Council has seventeen voting members, including the state marine fishery directors of the five Gulf states, eleven members of the public (all residents of Gulf states), and the Regional Director of the National Marine Fisheries Service.

In 1981, commercial purse seine operators had testified before the Gulf Council that if market incentives existed, the redfish harvest in the EEZ could be increased by one million

pounds. However, the Gulf Council chose not to develop management measures at that time.

**7.** The state laws allowed for the landing of the one million pounds in Mississippi, Alabama, and Louisiana.

**8.** Red drum taken as a by-catch in shrimp trawls (approximately 200,000 pounds annually) continued to be subject to state landing and possession laws.

(off the coasts of Mississippi, Alabama, and Louisiana) and a secondary area (off the coasts of Florida and Texas), and permanently closed the EEZ in the secondary area, (2) closed the directed commercial red drum fishery in the primary area until a goal of 20% escapement of juvenile fish from inshore waters was achieved, (3) retained the 100,000 pound quota for the indirect redfish fishery in the primary area, (4) provided for application of state landing and possession laws to redfish harvested in the indirect fishery, and (5) restricted the recreational fishery to one fish per person. The Amendment also provided for an annual scientific assessment of the red drum stock by the National Marine Fisheries Service (NMFS), and for an adjustment of the quotas by the Gulf Council.

Plaintiffs, associations of commercial fishermen and canning, processing, and other related interests, filed their original complaint on July 14, 1986, and their amended complaint on October 22, 1987. Defendants are the Secretary of Commerce, the Administrator of the National Oceanic and Atmospheric Administration (NOAA), the Assistant Administrator for Fisheries of NOAA, and the Director of the NMFS, all sued in their official capacities.

*Discussion*

In their amended complaint, plaintiffs challenge (1) defendants' failure to supersede state laws in the adoption of the implementing regulations for Amendment One to the FMP, (2) the establishment of the primary and secondary zones, and (3) the closure of the directed commercial red drum fishery. They seek a declaratory judgment, as well as injunctive relief. All parties have moved for summary judgment.

■ In providing courts with authority to review regulations implementing FMPs, the MFCA incorporates certain standards of review specified in the Administrative Procedure Act, 5 U.S.C.A. § 706(2).[9] 16 U.S.C.A. § 1855(b) (Supp.1991). According-

ly, under the relevant portions of the APA, a court may set aside a regulation only if it is found to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by law[.]

16 U.S.C.A. § 1855(b) (incorporating by reference 5 U.S.C.A. § 706(2)). A regulation will be found to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). "In short, the Secretary has broad discretion in promulgating regulations to implement the [FMP] and the Court may only consider 'whether this discretion was exercised rationally and consistently with the standards set by Congress....'" *Louisiana v. Baldridge*, 538 F.Supp. 625, 628 (E.D.La.1982) (quoting *Maine v. Kreps*, 563 F.2d 1052, 1055 (1st Cir.1977)); *see also Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir.1987) (reiterating courts' limited standard of review). "The question is not whether this Court agrees with the decision of the agency; the question is whether the decision made by the agency finds support in the administrative record." *C & W Fish Co. v. Fox*, 745 F.Supp. 6, 8 (D.D.C.1990), *aff'd*, 931 F.2d 1556 (D.C.Cir.1991). In making such a determination regarding FMP regulations, the Court must look to the National Stan-

---

9. While plaintiffs appear also to challenge the FMP itself, it is the regulations which implement the FMP, rather then the FMP itself, which are subject to judicial review. *See* 16 U.S.C.A. § 1855(b).

dards for Fishery Conservation and Management, as established by Congress and set forth at 16 U.S.C.A. § 1851(a).

■■■■ The issue of defendants' failure to supersede state law in promulgating the implementing regulations goes to the Agency's interpretation of the MFCA, a question of law.[10] Giving proper deference to the Agency, the Court must determine "whether the agency's [interpretation] is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The MFCA does not expressly preempt state regulation of the fishery. However, preemption will be implied if there is an actual conflict between state and federal law, such that dual compliance is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or would thwart the objectives of Congress. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). It is clear that federal regulations, no less than federal statutes, may have a preemptive effect. *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Indeed, the Agency's own guidelines interpreting National Standard 3 of the MFCA provide that "[f]ederal regulations supersede any conflicting State regulation of EEZ fishing." 50 C.F.R. § 602, Appendix A, Standard 3 (1990).[11]

■■■■ The Court finds that defendants' failure to supersede state law with respect to the indirect red drum fishery was arbitrary and an abuse of Agency discretion.

Under the MFCA, the federal government has exclusive management authority over fisheries in the EEZ. 16 U.S.C.A. § 1811(a). Consistent with this tenet, "a State may not directly or indirectly regulate any fishing vessel outside its boundaries, unless the vessel is registered under the law of that state." 16 U.S.C.A. § 1856(a)(3).

Defendants' red drum regulations provide for a 100,000–pound quota for the indirect red drum fishery. However, they also provide that commercial fishermen landing red drum from an indirect fishery must comply with state landing and possession laws. Because at least four of the five Gulf states prohibit or restrict the landing, possession, or sale of redfish, the state laws conflict with the federally imposed quota. Defendants, in effect, have told commercial fishermen that they may catch the fish, but that they may not land them. This makes no sense, and creates a conflict that is impermissible under the MFCA. Defendants' and intervenors' arguments to the contrary are wholly unpersuasive.

In adopting the Secretarial FMP, defendants themselves stated that "state laws and regulations which prohibit the landing, sale or interstate commerce of red drum harvested commercially outside State waters are in conflict with measures in the FMP." In accordance with that conclusion, defendants expressly superseded conflicting state laws in the Secretarial FMP. Less than a year later, the Secretary approved the Amendment to the FMP and issued the implementing regulations, reversing his position and expressly choosing not to supersede state landing laws.

---

**10.** As earlier stated, in a written Opinion issued on July 31, 1990, the Court held that the supersession issue with respect to the directed red drum fishery was not ripe for review. Since the case was filed, the Secretary has taken action to close also the indirect red drum fishery in the EEZ, raising a possible question as to the ripeness of the supersession issue with respect to it. *See* 50 C.F.R. § 653.22 (1990). However, the Court has determined that the issue is ripe for review, because the Agency has taken action on the issue. *See* 50 C.F.R. § 653.3(c) (1990) ("At such time as a [Total Allowable Catch] is speci-

fied, a person landing red drum other than from a directed commercial red drum fishery, must comply with the landing and possession laws of the State where landed.").

**11.** In addition, General Counsel's Opinion No. 93, "Supersession and Jurisdictional Operations Under § 306 of the Magnuson Act," issued January 29, 1981, concludes that "a properly promulgated federal regulation will supersede conflicting state regulation—direct or indirect—of [EEZ] fishing."

■ While a reversal of position in and of itself would not necessarily be considered arbitrary, defendants must provide a reasoned analysis supporting the change. *See Motor Vehicle Mfrs.*, 463 U.S. at 42, 103 S.Ct. at 2866. However, Amendment One simply provides that supersession "would adversely impact the cooperative state/federal approach to restoration/maintenance of the stock proposed under this amendment" and then discusses the costs of enforcement. Likewise, the explanation defendants now provide is that the reversal on the supersession issue reflects a new policy of cooperative management between the states and the federal government. Certainly cooperation between state and federal governments is permissible, as well as desirable, as long as the management schemes do not conflict and the objectives of the MFCA are accomplished. However, defendants emphasize the state-federal cooperation as if it were an end, indeed the most important end, unto itself. In so doing, they appear to have overlooked the fact that under the MFCA, effective fishery conservation and management, according to national standards, is the goal. If that can be accomplished through cooperative federal and state initiatives, a court would not interfere with the Secretary's scheme. However, in this case, the Secretary has allowed continued enforcement of state laws, which he has in the past acknowledged to be in conflict with federal regulations that he has promulgated. The Court, too, finds that a conflict exists and concludes, therefore, that the state laws cannot coexist in the federal scheme.

■ Additionally, the regulations require compliance with state laws, even if a vessel is not registered in the state where the catch is landed. Thus, the regulations go beyond what is authorized by the MFCA. *See* 16 U.S.C.A. § 1856(a)(3). In their Memorandum of Points and Authorities, defendants state that "[i]t is ... obvious that those state laws to which the Secretary has deferred, are valid only to the extent they apply to vessels registered in the state which is seeking to apply them." The Court agrees that the regulations would only be valid in that limited context. However, if defendants are arguing that the regulation may stand and will simply be applied as stated above, the Court must disagree. As written, defendants' regulation is invalid, as it provides that "a person landing red drum other than from a directed commercial red drum fishery, must comply with the landing and possession laws of the State where landed." It does not include a clause limiting the states to enforcement of its laws only as to fishing vessels registered in the state seeking enforcement. Although the Court must give deference to the Agency's interpretation and application of its own regulations, where, as in this instance, the regulation so clearly violates the Agency's enabling statute, the Court may not allow the regulation to stand. In addition, there is no evidence that the Agency has adopted a lawful interpretation of the regulation's reach or that it has applied the regulation narrowly. Instead, the Court has only what may be characterized as a litigation-generated rationale for the regulation.

■ Plaintiffs argue next that the division of the red drum fishery in the EEZ into primary and secondary zones is improper and is in violation of various provisions of the MFCA and the regulations. There is no question that the MFCA authorizes an FMP to "designate zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear[.]" 16 U.S.C.A. § 1853(b)(2). Such designation is within the discretion of the Council or the Secretary who prepared the FMP, and that discretion has been exercised in designating zones in several FMPs in the Gulf. *See, e.g.,* 50 C.F.R. §§ 638.22, 642.29, 658.22–658.25 (1990). Plaintiffs argue, however, that as to redfish, the division is unjustified and cannot stand.

■ An action by the Secretary is presumed to be valid, and the Court must not substitute its own judgment for that of the Secretary. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283

(D.C.Cir.1981). The Court must be especially wary of substituting its judgment for that of the Secretary in a situation in which the Secretary has called upon the scientific or technical expertise of the Gulf Council and the Agency. *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). The MFCA vests broad authority in the Secretary to promulgate regulations that will carry out the approved FMP. *See Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989). The Court has carefully reviewed the entire extensive administrative record in this case and will not attempt to repeat portions thereof. Based upon the record, the Court cannot and does not conclude that the division of the redfish fishery into primary and secondary zones was arbitrary and capricious.

█ Finally, plaintiffs argue that defendants' closure of the directed commercial red drum fishery in the EEZ pending a 20% escapement of juvenile fish from inshore waters is contrary to the National Standards and without a rational basis. Because commercial harvesting of redfish in the EEZ developed so suddenly and so rapidly, the Gulf Council and the Secretary were forced to make rapid decisions about the stock, based, unfortunately, on imperfect information. "However, the Magnuson Act does not force the Secretary and Councils to sit idly by, powerless to conserve and manage a fishery resource, simply because they are somewhat uncertain about the accuracy of relevant information" *National Fisheries Institute, Inc. v. Mosbacher*, 732 F.Supp. 210, 220 (D.D.C.1990). The National Standards require that an FMP and its regulations must be based upon "the best scientific evidence available." 16 U.S.C.A. § 1851(a)(2). Again, after a full review of the administrative record and, in light of all of the arguments raised by plaintiffs, the Court concludes that the decision of the Secretary is based upon relevant considerations and is supported by the record.

For all of the above reasons, it is appropriate to enter summary judgment in favor of plaintiffs and against defendants and defendant-intervenors as to supersession, and against plaintiffs and in favor of defendants and defendant-intervenors as to the division into zones and the closure of the directed redfish fishery.