MIDWATER TRAWLERS
COOPERATIVE, et
al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, et al., Defendants,

State of Washington, Petitioner,

v.

William M. Daley, United States
Secretary of Commerce,
Respondent,

State of Oregon, Plaintiff,

v.

William M. Daley, United States
Secretary of Commerce, et
al., Defendants,

West Coast Seafood Processors
Association, et al.,
Plaintiffs,

v.

William M. Daley, United States
Secretary of Commerce, et
al., Defendants.

Nos. C96–1808R, C96–5671R,
C99–1415R, C99–1500R.

United States District Court,
W.D. Washington,
at Seattle.

July 26, 2000.

Eric J. Bloch, Attorney General's Office, Dept. of Justice, Portland, OR, Stephen K.

Bushong, Miller, Nash, Wiener, Hager & Carlsen, Portland, OR, Allen D. Clark, Davis Wright Tremaine, Bellevue, WA, Robert Kirk Costello, Attorney General's Office, Fish & Wildlife, Olympia, WA, Barbara J. Gazeley, Attorney General's Office, Department of Justice, Salem, OR, James Martin Johnson, James M. Johnson, Olympia, WA, David E. Leith, Attorney General's Office, Department of Justice, Salem, OR, Mary E. McCrea, Attorney General's Office, Ecology Division, Olympia, WA, David D. Swartling, Mills Meyers Swartling, Seattle, WA, James P. Walsh, Davis Wright Tremaine, San Francisco, CA, Fonda C. Woods, Attorney General's Office Fish & Wildlife, Olympia, WA, for Plaintiffs in No. 2:96cv01808.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Peter C. Monson, U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, Christopher Lee Pickrell, U.S. Attorney's Office, Seattle, WA, Samuel D. Rauch, III, U.S. Department of Justice Enrd, Wildlife & Marine Resources, Washington, DC, Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, Jean E. Williams, U.S. Department of Justice, Environment & Natural Resources, Washington, DC, for Defendants in No. 2:96cv01808.

David S. Vogel, Seattle, WA, for Amicus in No. 2:96cv01808.

Robert Kirk Costello, Attorney General's Office Fish & Wildlife, Olympia, WA, Matthew Alan Love, U.S. Department of Justice Environmental & Natural Resources, Washington, DC, Fonda C. Woods, Attorney General's Office Fish & Wildlife, Olympia, WA, for Petitioner in No. 3:96cv05671.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Sammuel D. Rauch, III, U.S. Department of Justice, Enrd, Wildlife & Marine Resources, Washington, DC, for Respondent in No. 3:96cv05671.

Barbara J. Gazeley, David E. Leith, Attorney General's Office, Department of Justice, Salem, OR, for Plaintiff in No. 2:99cv01415.

Christopher Lee Pickrell, U.S. Attorney's Office, Seattle, WA, Samuel D. Rauch, III, U.S. Department of Justice, Enrd, Wildlife & Marine Resources, Washington, DC, Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, Jean E. Williams, U.S. Department of Justice, Environmental & Natural Resources, Washington, DC, for Defendants in No. 2:99cv01415.

Allen D. Clark, Davis Wright Tremaine, Bellevue, WA, James P. Walsh, Davis Wright Tremaine, San Francisco, CA, for Plaintiffs in No. 2:99cv01500.

Christopher Lee Pickrell, U.S. Attorney's Office, Seattle, WA, Samuel D. Rauch, III, U.S. Department of Justice Enrd, Wildlife & Marine Resources, Washington, DC, Tim Simmons, U.S. Attorney's Office, Portland, OR, Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for Defendants in No. 2:99cv01500.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT *

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on the parties' cross-motions for summary judgment. The court has reviewed the documents filed in support of and in opposition to the motions together with the relevant files. Being fully advised, the court finds that defendants are entitled to summary judgment.

## I. BACKGROUND

This action is a consolidation of four cases: two from 1996 and two from 1999. Plaintiffs are Midwater Trawlers Cooperative, West Coast Seafood Processors Association and Fisherman's Marketing Association (collectively, "Midwater"), the State of Washington, and the State of Oregon. They challenge rules and regulations promulgated by the Secretary of Commerce (the "Secretary") allocating groundfish catches off the Washington and Oregon coasts to four Northwest Indian tribes (the "Tribes").[1]

The Secretary's 1996 final rule ("Final Rule") established the regulatory framework for implementing the Tribes' treaty rights in the groundfish fishery and allocated a specific amount of Pacific whiting to the Makah for that year. See 61 Fed. Reg. 28786 (1996); 61 Fed.Reg. 34570 (1996); 50 C.F.R. § 660.324. Subsequent annual rules made specific allocations of whiting to the Makah based on the Final Rule. The federal defendants' administrative actions are based on the Tribes' treaty fishing rights and the court's continuing jurisdiction over these matters as set forth in United States v. Washington.[2] The fed-

---

* This opinion was edited on April 3, 2001 by the court for purposes of publication. No substantive changes were made.

1. The defendants include the Secretary, the United States Department of Commerce, and the National Marine Fisheries Service ("NMFS"). The Tribes are the Makah, the Quileute, Hoh, and Quinault. The court granted the Makah's unopposed motion to intervene as a defendant and the Quileute's and Quinault's unopposed motion to appear as amici. The Hoh and the Quileute are considered to be linguistically, culturally, and historically one people. See Barbara Lane, Anthropological Report on the Identity, Treaty Status and Fisheries of the Quileute and Hoh Indians at 1 (Brief of Amici Curiae Quileute Tribe and Quinault Nation, Ex. C.). Although the Hoh have not moved to appear in this case, the Quileute have thus far advanced arguments that are relevant to the Hoh's interests.

2. 384 F.Supp. 312 (W.D.Wash.1974), aff'd sub nom. Washington v. Washington State Com-

eral defendants justified the Final Rule, in part, upon Judge Rafeedie's determination that the Tribes' rights to take fish cover all fish available to them in their "usual and accustomed" ("U & A") fishing areas without any species limitation.[3] That determination was ultimately affirmed by the Ninth Circuit.[4]

In earlier orders in the 1996 cases, the court dismissed plaintiffs' Magnuson Act claims for failure to join the Tribes as necessary and indispensable parties, and granted summary judgment against plaintiffs on their claims under the Endangered Species Act and the Regulatory Flexibility Act. The Ninth Circuit reversed the court's dismissal of the Magnuson Act claims and affirmed the court's grant of summary judgment on all other claims. *See Washington v. Daley*, 173 F.3d 1158 (9th Cir. 1999).

The parties have filed cross-motions for summary judgment and agree that all issues may be resolved on the present record. Plaintiffs assert that the Final Rule and subsequent annual rules are arbitrary, capricious, or otherwise not in accordance with the law for four reasons: (1) the Tribes have no treaty right to harvest whiting; (2) the U & A fishing areas do not extend beyond three miles, i.e., they do not extend beyond Washington's territorial waters into the federal government's jurisdiction; (3) that a clause referring to the Tribes' role as "co-manager" of the "shared" fishery resources improperly ceded powers to the Tribes that are exclusively held by the federal government; and (4) that the 1999 allocation of whiting to the Makah, based upon a similar compromise allocation found in the Final Rule, is improper.[5]

## II. DISCUSSION

### A. *Standard of Review*

 The rules and regulations at issue here were issued under the authority of the Pacific Coast Groundfish Fishery Management Plan (FMP) and the Magnuson Fishery Conservation and Management Act (Magnuson Act). The Magnuson Act requires that the court apply the traditional Administrative Procedure Act (APA) arbitrary and capricious standard of review. *See* 16 U.S.C. § 1855(b); *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1562, 1565 (D.C.Cir.1991); *Southeastern Fisheries Ass'n v. Mosbacher*, 773 F.Supp. 435, 439 (D.D.C.1991). The court sets aside an action only if the Secretary's decision was arbitrary and capricious, an abuse of dis-

---

*mercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

**3.** *See United States v. Washington*, 873 F.Supp. 1422, 1430 (W.D.Wash.1994) [hereinafter *"Shellfish I "*], aff'd in relevant part, rev'd in part, 135 F.3d 618 (9th Cir.1998), *opinion amended and superceded*, 157 F.3d 630 (9th Cir.1998).

**4.** *See United States v. Washington*, 157 F.3d 630 (9th Cir.1998) [hereinafter *"Shellfish II "*].

**5.** Midwater's and Oregon's challenges to the 1996 and 1997 whiting allocations (the 1998 allocation was never challenged) are now moot. *See Washington v. Daley*, 173 F.3d at 1164–65 (noting that challenges to earlier allocations were moot but that challenge to framework regulation [upon which present allocation was based] was not moot). All parties have briefed the question of the 1999 allocation. To the extent that the 1999 allocation is mooted by the passage of time, the 2000 proposed allocation is also based upon the reasoning contained in the 1996 framework regulation. *See* 65 Fed.Reg. 247, 248 (Jan. 4, 2000).

The court presumes that the plaintiffs have abandoned all other claims raised in their complaints. The federal defendants have provided persuasive reasons why the other claims should be dismissed and the plaintiffs have chosen not to respond.

cretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *see Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir.1987). The court's "only function is to determine whether the Secretary 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Washington v. Daley*, 173 F.3d at 1169 (quoting *Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir.1996)). Accordingly, the court need decide only whether the Secretary could reasonably have concluded that the actions taken were lawful. *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir.1990). The standard of review is narrow and the court may not substitute its judgment for that of the agency. *See Washington v. Daley*, 173 F.3d at 1169.

B. *Treaty Right to Harvest Pacific Whiting*

■ Midwater argues that in 1996, when the Final Rule was adopted, no court had "affirmatively and precisely held that Indian fishing rights applied to Pacific whiting." Midwater's Memorandum in Support of Motion for Summary Judgment at 13. On this basis, Midwater argues that there was no "applicable law" on this question and, therefore, the federal defendants acted unreasonably by promulgating regulations recognizing such a right. *Id.* This argument lacks merit.

■ First, Midwater advances a flawed definition of "applicable law." Although Fishery Management Plans and regulations promulgated under the Magnuson Act must be consistent with the provi-

sions of the Magnuson Act and "other applicable law," 16 U.S.C. § 1853(a)(1)(C), 1854(a)(1)(B), "other applicable law" includes the Stevens Treaties negotiated between the United States and the Tribes in the 1850s.[6] *See, e.g., Parravano v. Babbitt*, 70 F.3d 539, 544 (9th Cir.1995); *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1440–41 (9th Cir. 1990). The Secretary need not await a specific adjudication prior to carrying out his obligation to promulgate regulations consistent with treaty rights. *See Makah Indian Tribe v. Brown*, No. C85–1606R (W.D.Wash.), Order on Five Motions relating to Treaty Halibut Fishing at 2, 5 (Dec. 29, 1993) (holding that Makah had right to harvest whiting and that past procedure for allocating halibut harvest violated those treaty rights) [hereinafter "*Makah v. Brown* Order"].

Second, Judge Rafeedie determined in 1994 that tribal rights are not limited by species of fish or by whether the Tribes harvested that species at the time of the Stevens Treaties. *See Shellfish I*, 873 F.Supp. at 1430. In the Final Rule, the Secretary cited Judge Rafeedie's decision as support for recognizing the Tribes' treaty right to whiting. 61 Fed.Reg. 28788. Judge Rafeedie's decision on this point has since been affirmed by the Ninth Circuit. *See Shellfish II*, 157 F.3d at 643–44.

Nonetheless, Midwater argues that Judge Rafeedie's holding was dictum and that the treaty rights to fish should be determined according to what species the Tribes had historically harvested at the time the Stevens Treaties were signed. This position is contradicted by the plain

---

6. The Stevens Treaties at issue here are the Treaty of Neah Bay (Makah), and the Treaty of Olympia (Quinault, Quileute, and Hoh). Article 4 of the Treaty of Neah Bay provides: The right to taking fish ... at usual and accustomed grounds and stations is further

secured to said Indians in common with all citizens of the United States ....
12 Stat. 939 (Jan. 31, 1855). The Treaty of Olympia contains similar language. 12 Stat. 971.

language both of Judge Rafeedie's decision and of the Ninth Circuit's affirmance. The Ninth Circuit rejected Washington's analogous argument as inconsistent with the language of the treaties, the law of the case, and the intent and understanding of the signatory parties. *See Shellfish II,* 157 F.3d at 643. It quoted Judge Rafeedie's opinion at length:

> At [Treaty] time, ... the Tribes had the absolute right to harvest any species they desired consistent with their aboriginal title.... The fact that some species were not taken before treaty time—either because they were inaccessible or the Indians chose not to take them—does not mean that their right to take such fish was limited. Because the "right of taking fish" must be read as a reservation of the Indians' pre-existing rights, and because the right to take any species, without limit, pre-existed the Stevens Treaties, the Court must read the "right of taking fish" without any species limitation.

*Id.* at 644 (quoting *Shellfish I,* 873 F.Supp. at 1430).

Third, this court has explicitly applied Judge Rafeedie's decision to find that there is a treaty right to harvest whiting. *United States v. Washington,* No. 9213, Phase I, Subproceeding 96–2, Order Granting Makah's Motion for Summary Judgment at 4 (Nov. 5, 1996) (recognizing that Judge Rafeedie's decision extended to permit treaty right to whiting). This court did so only months after the Final Rule

was issued. Thus, even if the court accepted Midwater's argument, which it declines to do, its request for relief is now moot.

The federal defendants did not act arbitrarily and capriciously in recognizing the Tribes' right to harvest Pacific whiting.

### C. *"Usual and Accustomed" Fishing Areas*

The Final Rule provides that, for purposes of the FMP, the U & A fishing areas of the Tribes extend west from Washington's coast to 12544′ West longitude, i.e., approximately 40 miles into the ocean.[7] *See* 50 C.F.R. § 60.324(c). Midwater contests this determination on two grounds. First, Midwater argues that *no* tribe has the right to usual and accustomed fishing areas beyond Washington's territorial waters, i.e., beyond three miles of the coast. Second, Midwater argues that although the U & A fishing areas for the Makah have been judicially determined, no such determination has been made for the Hoh, Quileute, and Quinault.[8]

### 1. *U & A Areas Beyond Three Miles*

In 1982, Judge Craig determined that the tribal U & As can extend beyond three miles. *See United States v. Washington,* 626 F.Supp. 1405, 1466–67 (W.D.Wash.1985) (compiling major post-trial, substantive orders from 1978 to 1985), *aff'd* 730 F.2d 1314 (9th Cir.1984). Midwater attempts to distinguish this pre-

---

7. The Final Rule also provides that the U & A fishing areas of the Tribes extends from the international boundary with Canada on the north (the most northerly portion of the Makah's treaty area) to 4653′ North latitude (the most southerly portion of the Quinault's treaty area.) *See* 50 C.F.R. § 660.324(c). The north-south boundaries are not at issue here.

8. Washington dismissed its claims regarding delineation of the Tribes' usual and accus-

tomed fishing areas for the cases being considered today. No. C96–1808R (consolidated), Stipulation and Order (March 21, 2000). The federal defendants contend that the only other party to raise this issue is Midwater, which did not plead it properly in its complaint. The court finds that Midwater arguably raised the U & A issue in its complaint. *See* No. C96–1808R, Amended Complaint for Declaratory and Injunctive Relief, ¶¶ 73a, 74a, Claim 1, Claim 2.

cedent by arguing that it "was merely a factual finding and did not address the issue of whether the signers of the Treaty needed to, or intended to, preserve rights outside the Territory of the State of Washington." Midwater's Reply at 10. This argument is unpersuasive.

First, Judge Craig found, as a matter of law, that the Treaty of Neah Bay secures to the Makah tribe rights in fishing grounds "that are under the fisheries management jurisdiction of the United States, including jurisdiction conferred upon the State of Washington." *United States v. Washington*, 626 F.Supp. at 1468. In affirming, the Ninth Circuit acknowledged that the Makah sought a legal determination of its U & A fishing areas, including the area within the fisheries management jurisdiction of the United States. *See United States v. Washington*, 730 F.2d at 1315–16. The Ninth Circuit engaged in a de novo application of the law to the facts and concluded that the "40–mile boundary found by the district court delineates the Makahs' usual and accustomed fishing areas." *Id.* at 1318.

■ Second, in order to find that Congress has extinguished an Indian treaty right, "[t]here must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (quoting *United States v. Dion*, 476 U.S. 734, 740, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986)). Midwater has presented no such evidence here.

Midwater's argument is based, instead, upon unconvincing inferences. Midwater argues that the treaty parties could not have meant to ensure fishing rights to the entire U & A grounds and stations because, when the Stevens Treaties were signed, no nation had control of the high seas beyond three miles of the shore. Midwater further argues that, regardless of original intent, the Magnuson Act must have extinguished the treaty rights by establishing the United States' sovereign rights and exclusive marine fishery management jurisdiction out to 200 nautical miles. *See* 16 U.S.C. § 1811. Midwater's interpretation is contrary to the Magnuson Act's language, basic tenets of treaty interpretation, and the understanding of the Tribes and the United States.

The Magnuson Act requires that FMPs and regulations promulgated under the Act be consistent with other applicable law, which law expressly includes Indian treaty rights. *See, e.g., Washington Crab Producers*, 924 F.2d at 1444. The Act itself requires that FMPs describe the "nature and extent" of any "Indian treaty fishing rights." 16 U.S.C. § 1853(a)(2). The fishing rights in the Stevens Treaties are " 'not a grant of rights to the Indians, but a grant of rights *from* them—a reservation of those not granted.' " *Shellfish I*, 873 F.Supp. at 1430. One of the Tribes' reserved rights is the right to fish in their U & A areas irrespective of management authority. *Cf. Washington v. Washington Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 696, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (noting that Magnuson Act "place[s] a responsibility on the United States, rather than the State, to police the take of fish ... to assure compliance with the treaties").

■ Furthermore, neither the United States nor the Tribes disputes the tribal right to fish within the federal fisheries management jurisdiction. Absent extraordinarily strong evidence to the contrary, the court will defer to the treaty parties' interpretation. *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

The Secretary did not act arbitrarily and capriciously in extending the usual and accustomed fishing areas beyond the three-mile territorial limit of Washington's coast.

### 2. *U & A Areas of the Hoh, Quinault, and Quileute*

■ Although Midwater acknowledges that the court has established U & A fishing areas for the Makah out to 40 miles, it argues that the Secretary acted unreasonably in defining the U & A fishing areas for the Hoh, Quileute, and Quinault because no court has yet precisely defined these areas. Again, Midwater's argument lacks merit.

■ Treaties are self-executing and obligatory on the contracting parties as soon as they are ratified. *See Washington v. Washington Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 693 n. 33, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). As set forth above, the Secretary was required by the Magnuson Act to recognize the Tribes' treaty rights to take fish within U & A areas. Midwater can cite no authority for the proposition that the Secretary must wait for a court adjudication before attempting to implement these treaty rights.

The Secretary employed the same boundaries for the U & A areas of the Hoh, Quinault, and Quileute regarding Pacific whiting that have been used for years without objection in the federal salmon and halibut regulations. *See, e.g.,* 51 Fed. Reg. 16471, 16472 (May 2, 1986); 52 Fed. Reg. 172964, 17271–72 (May 6, 1987). As the defendants point out, a 1985 opinion of the Regional Solicitor for the Department of the Interior found evidence that the Hoh, Quileute, and Quinault engaged in fishing activities out to 25 to 50 miles. Report on Indian Treaty Right to Fish for Halibut from Lawrence E. Cox, Acting Regional Solicitor to Stanley Speaks, Port-land Area Director, Bureau of Indian Affairs (April 1985) (Brief of Amici Curiae Quileute Tribe and Quinault Nation, Ex. B); *see* Dr. Barbara Lane, Traditional Marine Fisheries of the Quileute and Hoh Indians at 1 (Aug. 4, 1977) (Brief Of Amici Curiae Quileute Tribe and Quinault Nation, Ex. E); Dr. Barbara Lane, Traditional Ocean Fisheries of the Quinault Indians at 1 (Sept. 25, 1977) (Brief Of Amici Curiae Quileute Tribe and Quinault Nation, Ex. F). The U & A areas established in the salmon and halibut regulations were issued shortly after the Regional Solicitor's 1985 opinion.

■ As discussed earlier, the Tribes' right to harvest fish within their U & A areas is not limited by species of fish. *See Shellfish II,* 157 F.3d at 643–44; *Shellfish I,* 873 F.Supp. at 1430. In the absence of any judicial determination in *United States v. Washington* to the contrary, it was, therefore, reasonable for the federal defendants to conclude that using the same salmon and halibut U & As for Pacific whiting was lawful.

### D. *Challenge to Language Added to Final Rule*

■ The State of Washington challenges the following language, which was added to the Final Rule at the request of the Quileute:

> The Secretary recognizes the sovereign status and comanager role of Indian tribes over shared federal and tribal fishery resources. Accordingly, the Secretary will develop tribal allocations and regulations under this paragraph, in consultation with the affected tribe(s) and, insofar as possible, with tribal consensus.

50 C.F.R. § 660.324(d); 61 Fed.Reg. at 28791.

Washington contends that the additional language violates the Magnuson Act's

grant of exclusive management authority over a certain area to the United States, is inconsistent with the open public process required by the Act, and was adopted without the required notice and opportunity for comment.

### 1. *Sovereign and Co–Manager Status over "Shared" Resources*

The Magnuson Act grants to the United States exclusive management authority over all fish within the exclusive economic zone ("EEZ"). 16 U.S.C. § 1811(a). Washington acknowledges the sovereign status of the Tribes and their treaty right to fish for groundfish within the EEZ. Washington's Reply Memorandum at 5. Washington also recognizes the Tribes' authority to manage their own tribal fisheries. *Id.* Washington argues, however, that the challenged language confers upon the Tribes an additional legal interest in the fishery resources.

The court does not read the challenged language in the same way. The challenged clause does not create title to the fish or in any way alter the Tribes current "legal status vis-a-vis the resource." The parties all agree that the Tribes have no claim of a property ownership interest in the fish. *See Foss v. NMFS,* 161 F.3d 584, 587 (9th Cir.1998) (citing *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 284, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977)) (noting that any claim of owning fish themselves is "pure fantasy"). Furthermore, the unchallenged portion of the Final Rule contains language that has a similar effect to that of the challenged portion: that the Tribes "will ... manage[ ]" their fishery allocation, thereby making them, in effect, co-managers of the shared resources. *Compare* 61 Fed.Reg. 10308 (March 13, 1996) *with* 61 Fed.Reg. at 28791. The federal defendants note that tribal management of such fishery allocations has occurred since at least 1990. *See* AR 23–24 (providing for tribal management of its own sablefish fishery).

Washington argues that if the challenged clause is interpreted in this innocuous fashion, then the language constitutes surplusage that should be stricken. The court does not, however, monitor economy of language. The Secretary did not act arbitrarily and capriciously by adding language that provides no more than a statement acknowledging the practical realities of fisheries management.

### 2. *Magnuson Act Open Public Process*

Washington argues that the Final Rule also violates the open public process prescribed by the Magnuson Act. *See* 16 U.S.C. §§ 1801(b)(5)(A), 1852(h)(3). That process requires, among other things, that amendments to FMPs be submitted to the Regional Fishery Management Council, which conducts public hearings to allow all interested persons an opportunity to be heard. *See* 16 U.S.C. § 1852(h)(3), 1852(i) (Supp.1999). According to Washington, the challenged language allows the Tribes to circumvent this process by providing that the Secretary will develop and implement the allocations and regulations through "consultation with the affected tribe(s) and, insofar as possible, with tribal consensus." In effect, Washington argues that tribal participation in setting tribal allocations is limited by the Magnuson Act to making an initial request and to providing comments during the Council process because any other form of consultation is improperly "ex parte." This interpretation is incorrect.

That the federal government may consult with the Tribes over the application of their treaty rights is well-grounded in the government's trust relationship with the tribes. *See, e.g., Parravano v. Babbitt,* 70 F.3d 539, 546 (9th Cir.1995); *Washington v. Daley,* 173 F.3d at 1168; *see also United*

*States v. Mitchell,* 463 U.S. 206, 226, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Such government-to-government consultation underlies the federal government's policy of tribal "self-determination." *See, e.g.,* President William J. Clinton, Government–to–Government Relations with Native American Tribal Governments: Memorandum for the Heads of Executive Departments and Agencies, 59 Fed.Reg. 22951 (Apr. 29, 1994). There is nothing in the Magnuson Act that prohibits such consultation or requires that such consultation occur only "on the record."

The Administrative Procedure Act, the process utilized by the Magnuson Act, prohibits ex-parte contacts only in formal adjudicatory hearings which are required by statute to be determined "on the record." 5 U.S.C. § 554(d). Unless the implementing statute requires an "on the record" hearing, the agency may establish its own procedures, including allowing "ex parte" contacts. *See Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 922 n. 63 (D.C.Cir.1982). The public process set forth in the Magnuson Act permits participation in the regulatory process; it does not bar participation outside of this process. *See, e.g.,* 16 U.S.C. § 1854(a)(2) (providing that in reviewing plans or amendments Secretary is to "take into account the information, view, and comments received from interested persons").

The challenged clause sets forth no more than a requirement to consult the Tribes regarding tribal allocations. It in no way commands the Secretary to allocate fishery resources based entirely upon tribal consensus. The Secretary reasonably concluded that including the challenged provision would not violate the law.

### 3. *Notice and Comment*

Washington argues that the challenged clause was not a logical outgrowth of the notice and comments received and, therefore, that notice and an opportunity to comment on the added clause was required. The court disagrees.

■■■■■ An agency "need not 'publish in advance every precise proposal which it may ultimately adopt as a rule.'" *Rybachek v. United States EPA,* 904 F.2d 1276, 1287 (9th Cir.1990) (citing *California Citizens Band Ass'n v. United States,* 375 F.2d 43, 48 (9th Cir.1967)). The agency must merely publish the "'terms and substance of the proposed rule or a description of the subjects and issues involved.'" *Id.* (citing 5 U.S.C. § 553(b)(3)). The terms of a final rule may vary substantially from the proposed rule. *See id.* The court determines as a matter of law whether the inclusion of the varied terms in the final rule "was in character with the original proposal and a logical outgrowth of the notice and comments received." *Id.* at 1288.

The proposed rule informed Washington that the Secretary was considering a management regime for the harvest of whiting by the Tribes. *See* 61 Fed.Reg. 10303, 10304 (March 13, 1996). The challenged clause was a reasonable description of how the United States deals with the Tribes in relation to their treaty rights and was a logical outgrowth of comments by the Quileute about the proposed rule. The court finds, therefore, that the Secretary need not have afforded others notice of and the opportunity for comment on the added clause.

### E. *1999 Allocation of Whiting to the Makah*

In the proposed rule and in the Final Rule, NMFS stated its view that the appropriate method for quantifying the Makah's treaty right to whiting was to base the entitlement on the amount of whiting biomass in the tribal U & A fishing area while taking into account the "conservation

necessity" principle. *See* 61 Fed.Reg. at 28792. Using this methodology, NMFS would have allocated 13,800 metric tons ("mt") of whiting to the Makah for 1996. The Makah, however, initially proposed an allocation that would have resulted in their harvesting up to approximately 25% of the total United States harvest (about 31,800 mt for 1996). *See id.* at 28792. To resolve this dispute, the Makah instituted Subproceeding 96–2 in *United States v. Washington,* which is pending before this court.

In the meantime, the Makah and NMFS agreed to compromise for 1996 on an allocation of 15,000 mt. NMFS explained its reasoning as follows:

> NMFS acknowledges that many difficult questions have been raised, and that there is much uncertainty regarding what is a complex and difficult technical and legal issue. NMFS believes that allocating 15,000 mt of whiting to the Makah for 1996, although a compromise, provides both a reasonable accommodation of the treaty right and additional time for the NMFS to work with other Federal agencies, the States, and the tribes to resolve these issues. Because the 15,000 mt allocated to the Makah for 1996 is not significantly greater than the quantity of fish NMFS would have allocated in 1996 under its own proposal (13,800 mt), *NMFS believes that the compromise is within the range of the treaty right.* NMFS intends to seek resolution of the treaty right quantification issue either through continued discussions with the tribes or in the context of the recent subproceeding 96–2 in *United States v. Washington.*

61 Fed.Reg. at 28793 (emphasis added). In 1999, NMFS set a Makah tribal allocation in the amount of 32,500 mt. It relied upon the same reasoning as before:

In 1996, the Makah instituted a subproceeding in *U.S. v. Washington,* Civil No. 9213–Phase I, Subproceeding No. 96–2, regarding their treaty right to whiting, including the issue of the appropriate quantification of that right. The quantification issue has not yet been litigated or otherwise resolved. The Makah have made a proposal for 32,500 mt of whiting in 1999 that NMFS accepts as a reasonable accommodation of the treaty right from 1999 in view of the remaining uncertainty surrounding the appropriate quantification. This 1999 amount of 32,-500 mt (14 percent of the 232,000–mt OY) is not intended to set a precedent regarding either quantification of the Makah treaty right or future allocations. NMFS will continue to attempt to negotiate a settlement in *U.S. v. Washington* regarding the appropriate quantification of the treaty right to whiting. If an appropriate methodology or allocation cannot be developed, the allocation will ultimately be resolved in the pending subproceeding in *U.S. v. Washington.*
*Id.*[9]

Midwater and Oregon argue that it was arbitrary and capricious for the Secretary to adopt a compromise treaty allocation of whiting to the Makah rather than making an allocation based upon the scientific allocation principles set forth in the 1996 proposed rule but never finally adopted by the Secretary. The court concludes otherwise.

NMFS declined to use its own proposed methodology not because it refused to apply scientific information, but because it acknowledged that there were significant legal and technical reasons why its methodology might be flawed. NMFS' allocation was based on the proportion of the biomass of whiting found in the Makah's U

---

**9.** The court addresses the 1996 framework rule and the 1999 allocation because these were fully briefed by the parties. The same reasoning applies, however, to the proposed 2000 allocation.

& A, a methodology which, in an unmodified form, had been rejected with respect to halibut in the *Makah v. Brown* Order. *See Makah v. Brown* Order at 5–6; 61 Fed.Reg. at 28792. NMFS recognized the need to account for the "conservation necessity principle." 61 Fed.Reg. at 28792. The "conservation necessity principle" holds that the amount of fish available for harvest must be based solely on resource conservation needs. *See Makah v. Brown* Order at 6. Accounting for the "conservation necessity principle," is, however, complicated by the lack of legal and technical precedents applicable to Pacific whiting. *See* 61 Fed.Reg. at 28792; *see also* 64 Fed.Reg. 27928 (May 24, 1999).

NMFS's initial proposal was to account for the conservation necessity principle by including a multiplier, by which the percentage of the biomass in Makah U & A grounds would be increased. *See* 61 Fed. Reg. 28791; 61 Fed.Reg. 10305–06. NMFS acknowledged, however, that other proposals existed that would entitle the Makah to a greater share. *See* 61 Fed. Reg. at 28792 (discussing Makah comments on NMFS' proposal). The treaty fishing right is the opportunity to take a fair share of the fish, which is interpreted to mean up to 50% of the harvestable surplus of fish that are destined to pass through the Tribes' U & A grounds. *See Washington v. Washington State Comm'l Fishing Vessel Ass'n*, 443 U.S. 658, 685–87, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Shellfish II*, 157 F.3d 630, 651, 652; *Shellfish I*, 873 F.Supp. 1422, 1445 and n. 30; *Makah v. Brown* Order at 2; *United States v. Washington*, 459 F.Supp. 1020, 1065 (W.D.Wash.1978) (compiling major post-trial substantive orders through 1978). The Makah argue that because whiting is a unitary stock, the majority of which, if not all, pass through the Makah's U & A area, it is entitled to up to 50% of all whiting on the Pacific coast. *See, e.g.*, 61 Fed.Reg. 28791–92.

The court need not determine here the proper methodology to quantify the Makah's treaty right to Pacific whiting; that is the purpose of the pending *United States v. Washington* subproceeding. What the court must determine is whether, given the present record, the Secretary acted arbitrarily and capriciously in setting the whiting allocation that he did. The fact that the allocation was the result of a compromise does not necessarily invalidate the allocation, provided that the allocation fits within the conservation necessity principle. *See Makah v. Brown* Order at 5–6.

The 1999 allocation (32,500 mt) represents 14% of the total allowable catch (232,000 mt). 64 Fed.Reg. 27928, 27930 (May 24, 1999). The total tribal allocation for 1999 was proposed to be in the range of 25,000 to 35,000 mt, with the lower end representing the Pacific Fishery Management Council's proposal and the upper end representing the tribal proposal accepted by the Secretary. 64 Fed.Reg. 27929 (May 24, 1999). This 14% allocation was well within the 50% limit on the amount of whiting to which the Makah may be entitled based upon the conservation necessity principle. Neither NMFS nor any plaintiff has specified a concrete conservation concern arising from this allocation. Thus, pending a decision regarding this issue in the subproceeding, the court finds that the Secretary did not act arbitrarily and capriciously in adopting a compromise treaty allocation of whiting to the Makah.

## III. CONCLUSION

Defendants' motions for summary judgment are GRANTED; plaintiffs' motions for summary judgment are DENIED.